[INITIAL BRIEF]

**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 24-1350**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CBOE GLOBAL MARKETS, INC., CBOE BZX EXCHANGE, INC., CBOE
BYX EXCHANGE, INC., CBOE EDGA EXCHANGE, INC., CBOE EDGX
EXCHANGE, INC., NASDAQ, INC., THE NASDAQ STOCK MARKET LLC,
NASDAQ BX, INC., AND NASDAQ PHLX LLC,

*Petitioners*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition For Review Of A Rule
Of The United States Securities And Exchange Commission

**OPENING BRIEF FOR PETITIONERS**

Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr. Suite 7100
Chicago, IL  60606
(312) 258-5702
paul.greenwalt@afslaw.com
michael.molzberger@afslaw.com

*Counsel for Petitioners Cboe Global
Markets, Inc., Cboe BZX Exchange, Inc.,
Cboe BYX Exchange, Inc., Cboe EDGA
Exchange, Inc., Cboe EDGX
Exchange, Inc.*

Amir C. Tayrani
Alex Gesch
Cameron J.E. Pritchett
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 887-3692
atayrani@gibsondunn.com
agesch@gibsondunn.com
cpritchett@gibsondunn.com

*Counsel for Petitioners Nasdaq, Inc.,
The Nasdaq Stock Market LLC, Nasdaq
BX, Inc., and Nasdaq PHLX LLC*

(Additional Counsel Listed On Inside Front Cover)

Jeffrey S. Davis
Brett M. Kitt
Joanne Pedone
John Yetter
NASDAQ, INC.
805 King Farm Boulevard
Rockville, MD  20850

*Counsel for Petitioners Nasdaq, Inc.,*
*The Nasdaq Stock Market LLC, Nasdaq*
*BX, Inc., and Nasdaq PHLX LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Petitioners submit this Certificate as to Parties, Rulings, and Related Cases:

### A.    Parties

The parties in this case are Petitioners Cboe Global Markets, Inc., Cboe BZX Exchange, Inc., Cboe BYX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Nasdaq, Inc., The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq PHLX LLC, and Respondent United States Securities and Exchange Commission (the "Commission").

The Securities Industry and Financial Markets Association has filed a notice of intent to appear as *amicus curiae* in support of Petitioners.

### B.    Rulings Under Review

Petitioners seek review, under 15 U.S.C. § 78y(b)(1), of the Commission's final rule entitled Regulation NMS:  Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders, Release No. 34-101070, 89 Fed. Reg. 81,620 (Oct. 8, 2024) ("Access-Fee Rule").  *See* JA__.

### C.    Related Cases

This case has not previously been before this Court.  The Court initially consolidated the petition in Case No. 24-1350 with the petitions in Case Nos. 24-1302, 24-1303, 24-1317, and 24-1319.  The consolidation was terminated when

the petitioners in Case Nos. 24-1302, 24-1303, 24-1317, and 24-1319 subsequently

filed a stipulated dismissal without prejudice of their petitions.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Petitioners state as follows:

The Nasdaq Stock Market LLC, Nasdaq BX, Inc., and Nasdaq PHLX LLC are registered national securities exchanges. Each is wholly owned by Nasdaq, Inc., a public company. Borse Dubai Ltd. and Investor AB each own more than 10% of Nasdaq, Inc.'s shares.

Cboe BZX Exchange, Inc., Cboe BYX Exchange, Inc., Cboe EDGA Exchange, Inc., and Cboe EDGX Exchange, Inc. are each a direct or indirect wholly owned subsidiary of Cboe Global Markets, Inc., a public company. Cboe Global Markets, Inc. has no parent corporation, and The Vanguard Group, Inc. and BlackRock, Inc. each own 10% or more of Cboe Global Markets, Inc.'s common stock.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ..................................................vi

GLOSSARY ..............................................................vi

INTRODUCTION .........................................................1

STATEMENT OF JURISDICTION...........................................6

STATEMENT OF ISSUES ................................................6

STATUTES AND REGULATIONS .........................................7

STATEMENT OF THE CASE..............................................7

    A.    Regulatory Background .........................................7

    B.    The Fee Pilot .................................................11

    C.    Proposed Access-Fee Rule.......................................14

    D.    Final Access-Fee Rule .........................................16

    E.    Procedural History .............................................20

STANDARD OF REVIEW ................................................20

SUMMARY OF ARGUMENT .............................................21

STANDING ............................................................25

ARGUMENT ...........................................................25

    I.    THE COMMISSION LACKS STATUTORY AUTHORITY TO SET AN ACROSS-THE-BOARD ACCESS-FEE CAP ............................25

    II.    THE COMMISSION'S ADOPTION OF A 10-MILS ACCESS-FEE CAP IS ARBITRARY AND CAPRICIOUS ................................31

A.   The Commission Failed To Acknowledge Its Prior
     Uncertainty About The Market Impact Of Exchanges'
     Fees And Rebates ..................................................................32

B.   The Commission Failed To Provide A Reasoned
     Explanation For Its Newfound Confidence About The
     Impact Of A Dramatic Access-Fee Cap Reduction .................36

     1.   Transaction Costs ...........................................................36

     2.   Shifting Order Flow To Off-Exchange Trading
          Venues ............................................................................39

     3.   Conflicts Of Interest .......................................................42

C.   The New Access-Fee Cap Of 10 Mils Is Not Supported
     By Record Evidence ................................................................48

     1.   The Commission Erroneously Analogized
          Exchanges To Alternative Trading Systems .................49

     2.   The Commission's Other Reasons For Setting The
          Fee Cap At 10 Mils Are Not Supported By Record
          Evidence .......................................................................53

D.   The Court Should Vacate The New Access-Fee Cap And
     The Inextricably Intertwined Amendment To The
     Minimum Pricing Increment ....................................................59

CONCLUSION ....................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
  3 F.4th 373 (D.C. Cir. 2021) ................................................................30

*Am. Radio Relay League v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ............................................................48

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ............................. 32, 34, 36, 37, 39, 43

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ....................................................56, 58

*Bartenwerfer v. Buckley*,
  598 U.S. 69 (2023) ......................................................................22, 27

*Carlson v. Postal Reg. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ............................................................31

*Cboe Futures Exch., LLC v. SEC*,
  77 F.4th 971 (D.C. Cir. 2023) ............................................................59

*Chamber of Com. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ..............................................................38

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
  707 F.3d 462 (4th Cir. 2013) ..............................................................50

*Eagle Pharm. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ............................................................26

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009) ..............................................5, 21, 23, 32, 36, 37

*Genuine Parts Co. v. EPA*,
  890 F.3d 304 (D.C. Cir. 2018) ....................................................42, 53

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) .................................................48

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023) ...............................................32

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) .........................................................30

*Marin Audubon Soc'y v. FAA*,
  121 F.4th 902 (D.C. Cir. 2024) .............................................31

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
  Ins. Co.*,
  463 U.S. 29 (1983) ..............................................21, 36, 49, 50

*Nat. Res. Def. Council v. Regan*,
  67 F.4th 397 (D.C. Cir. 2023) ...............................................25

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  417 F.3d 1272 (D.C. Cir. 2005) .............................................25

*NYSE v. SEC*,
  962 F.3d 541 (D.C. Cir. 2020) .................... 2, 12, 13, 14, 25, 34, 46

*Prohibition Juice Co. v. U.S. FDA*,
  45 F.4th 8 (D.C. Cir. 2022) ...................................................36

*Sorenson Commc'ns, Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ...............................................40

*Susquehanna Int'l Grp., LLP v. SEC*,
  866 F.3d 442 (D.C. Cir. 2017) .......................................23, 45, 46, 51

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .............................................................30

*Yakima Valley Cablevision v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ...........................................46, 48

**Statutes**

5 U.S.C. § 706(2) ...................................................................59

5 U.S.C. § 706(2)(A) ..........................................................................20

15 U.S.C. § 78f ........................................................................8, 29, 30

15 U.S.C. § 78f(b) .....................................................................27, 28

15 U.S.C. § 78f(b)(4) .............................................3, 8, 21, 22, 26, 27

15 U.S.C. § 78f(e)(2) .......................................................................27

15 U.S.C. § 78k-1 .......................................................................6, 30

15 U.S.C. § 78k-1(c)(1)(B) ..................... 3, 16, 21, 22, 26, 27, 29, 30, 31

15 U.S.C. § 78q(b) ...........................................................................52

15 U.S.C. § 78s ................................... 2, 3, 22, 27, 28, 29, 30, 31

15 U.S.C. § 78s(b) .......................................................................8, 28

15 U.S.C. § 78s(b)(2) ........................................................................28

15 U.S.C. § 78s(b)(3) ........................................................................28

15 U.S.C. § 78s(c) .............................................................................28

15 U.S.C. § 78y(b) ..............................................................................6

15 U.S.C. § 78ee(a) ...........................................................................26

## Regulations

17 C.F.R. § 242.301(b)(9) ................................................................52

17 C.F.R. § 242.600(b)(82) ..............................................................10

17 C.F.R. § 242.610(c) ......................................................................10

## Other Authorities

*In re Mot. for Stay of Effect of Amends. to Rules 610 & 612 of Regul.*
    *NMS*, Release No. 34-101899, File No. S7-30-22,
    2024 WL 5094955 (Dec. 12, 2024) ...............................................20

*Order Disapproving Proposed Rule Change to Increase Fees for Certain Market Data and Connectivity Products*,
89 Fed. Reg. 95,822 (Dec. 3, 2024) ................................................................. 28

*Regulation Best Execution*, Release No. 34-96496,
88 Fed. Reg. 5440 (Jan. 27, 2023) .................................................................. 47

*Regulation NMS*, Release No. 34-51808,
70 Fed. Reg. 37,496 (June 29, 2005) ............................................................... 10

S. Rep. No. 94-75 (Apr. 14, 1975) .................................................................. 29, 30

*Transaction Fee Pilot for NMS Stocks*, Release No. 34-82873,
83 Fed. Reg. 13,008 (Mar. 26, 2018) ........................................................... 11, 54

*Transaction Fee Pilot for NMS Stocks*, Release No. 34-84875,
84 Fed. Reg. 5202 (Feb. 20, 2019) ...................... 1, 3, 4, 6, 9, 11, 12, 13, 14, 17,
18, 19, 22, 33, 37, 38, 39, 43, 52

# GLOSSARY

| | |
|---|---|
| Access-Fee Rule, Rule | Regulation NMS:  Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders, Release No. 34-101070, 89 Fed. Reg. 81,620 (Oct. 8, 2024) |
| Cboe | Cboe Global Markets, Inc. |
| Exchange Act | Securities Exchange Act of 1934 |
| Nasdaq | Nasdaq, Inc. |
| Proposed Rule | Regulation NMS:  Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders, Release No. 34-96494, 87 Fed. Reg. 80,266 (Dec. 29, 2022) |
| SEC | United States Securities and Exchange Commission |
| Fee Pilot | Transaction Fee Pilot for NMS Stocks, Release No. 34-84875, 84 Fed. Reg. 5202 (Feb. 20, 2019) |

## INTRODUCTION

The Securities and Exchange Commission (the "Commission") has adopted a rule that drastically reduces the cap on transaction fees that national securities exchanges are permitted to charge for accessing orders for equity securities (i.e., completing a trade) on their platforms and that, by extension, restricts the rebates that exchanges fund with those fees and pay to attract order flow.  The Commission took that action without acknowledging that, only six years earlier, the Commission conceded that it *did not know* what would happen if it took this potentially market-destabilizing step.

It was precisely because of that uncertainty that, in 2018, the Commission adopted an experimental "Fee Pilot" that was intended to "facilitate an empirical evaluation" of the existing exchange fee-and-rebate model.  *Transaction Fee Pilot for NMS Stocks*, Release No. 34-84875, 84 Fed. Reg. 5202, 5204 (Feb. 20, 2019).  The Commission's Fee Pilot sought to introduce an "exogenous shock" to the securities market to gather data informing whether future regulatory changes to access fees and rebates would be beneficial.  *Id.* at 5226, 5259.  At the time, the Commission acknowledged that it "lack[ed] the data" necessary to reach conclusions about whether, and to what extent, lowering access fees, and the rebates funded by those fees, would disrupt market dynamics.  *Id.* at 5282.  This Court vacated the Fee Pilot Rule because the Commission had no statutory authority to "impose significant,

costly, and disparate regulatory requirements" merely to see "whether there is a problem worthy of regulation." *NYSE v. SEC*, 962 F.3d 541, 555, 557 (D.C. Cir. 2020).

Despite the Commission's recent expressions of uncertainty and its inability to gather relevant data through the Fee Pilot, the Commission has now decided to move forward with a substantial reduction to the longstanding access-fee cap of $0.003 per share (or "30 mils"), which has been in place since 2005. This time, rather than imposing a temporary fee-cap reduction on transactions in a subset of securities as a data-gathering exercise, the Commission has adopted a permanent, universally applicable access-fee cap of $0.001 (or "10 mils"), JA_[89.Fed.Reg.81,620,81,624] (the "Access-Fee Rule" or "Rule")—the same two-thirds reduction that the Commission sought to study in its failed Fee Pilot.

Like the Fee Pilot Rule before it, the Access-Fee Rule exceeds the Commission's statutory authority under the Securities Exchange Act ("Exchange Act") and violates the requirements of reasoned decision-making under the Administrative Procedure Act.

*First*, the Commission lacks statutory authority to adopt rules imposing fee caps that apply across the board to all exchanges. Congress specifically authorized the Commission—under Section 19 of the Exchange Act, 15 U.S.C. § 78s—to review individual exchanges' fees on a case-by-case basis to ensure that each fee is

"reasonable" and "equitab[ly] allocat[ed]" within the meaning of Section 6 of the Exchange Act, *id.* § 78f(b)(4). In the Access-Fee Rule, however, the Commission bypassed the individualized assessment that Congress mandated in Section 19 and invoked an entirely different provision of the Exchange Act—Section 11A(c)(1)(B), *id.* § 78k-1(c)(1)(B)—to impose its sweeping, undifferentiated fee-cap reduction. *See* JA_[89.Fed.Reg.at.81,655]. But the plain language of Section 11A(c)(1)(B) does not mention fees. And because Congress expressly authorized the Commission to regulate "fees" in other parts of the Exchange Act—and specified detailed procedures for doing so—this omission was plainly deliberate and meaningful.

*Second*, the Commission violated the APA's requirements for reasoned decision-making by failing to acknowledge its prior uncertainty about the consequences of reducing the access-fee cap. In the Fee Pilot Rule, the Commission conceded that there is an "information gap" about "the impact that exchange transaction fee-and-rebate pricing models have on order routing behavior, market and execution quality, and our market structure generally." 84 Fed. Reg. at 5203. In the Access-Fee Rule, however, the Commission unequivocally concluded that a two-thirds reduction in the access-fee cap to 10 mils—and corresponding reduction in exchanges' ability to pay rebates to attract liquidity—"*will* benefit investors and market participants." JA_[89.Fed.Reg.at.81,621] (emphasis added). The Commission did not even mention its recent "uncertainty"—a word that appears

3

dozens of times in the Fee Pilot Rule—let alone explain why it is now able to reach definitive conclusions about complex questions that, only six years earlier, it had sought to study due to a "lack of empirical clarity." 84 Fed. Reg. at 5219.

In the Fee Pilot Rule, for example, the Commission acknowledged that it could not "predict whether investors will face higher or lower transaction costs in th[e] new equilibrium" created by the Pilot's reduced fees and rebates. 84 Fed. Reg. at 5277. Yet, the Commission declared decisively in the Access-Fee Rule that the "adopted amendments to Rule 610 *will* lower costs for investors and other market participants." JA_[89.Fed.Reg.at.81,629] (emphasis added). Similarly, in the Fee Pilot Rule, the Commission admitted that it could not "ex ante predict" whether lowering access fees would shift trading volume to off-exchange venues. 84 Fed. Reg. at 5281-82. But in the Access-Fee Rule, the Commission rejected that possibility out of hand, asserting that a lower cap could actually drive more transactions *to* exchanges. *See* JA_[89.Fed.Reg.at.81,762]. And the Commission admitted in the Fee Pilot Rule that it was "not certain" about whether exchanges' fee-and-rebate structure creates conflicts of interest that lead broker-dealers to route orders in ways detrimental to investors. 84 Fed. Reg. at 5277-78. Yet in the Access-Fee Rule, the Commission declared definitively that "the lower access fee cap is . . . expected to reduce broker-dealer conflicts of interest." JA_[89.Fed.Reg.at.81,756].

To be sure, agencies are permitted to change their minds.  But an agency first must acknowledge its prior position and display awareness that it is deviating from that earlier view, and then must explain and support its new position with evidence-based reasoning.  *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

The Commission did neither here.  The Commission entirely failed to acknowledge its prior uncertainty about the numerous complicated questions implicated by exchanges' fees and rebates.  And the Commission likewise failed to support its new position—that a two-thirds reduction in the longstanding fee cap "will benefit" investors and the market, JA_[89.Fed.Reg.at.81,621]—with cogent reasoning and evidence.

Because the Commission concededly lacked data to reach conclusions about access fees and rebates when it promulgated the Fee Pilot Rule, the Commission was required to support its current definitive conclusions with evidence gathered in the intervening years.  But rather than undertake the independent analysis of the record and thorough assessment of regulatory alternatives necessary to justify any fee-cap reduction—as well as the specific 10-mils cap it decided to adopt—the Commission merely recycled much of the same evidence it cited in the Fee Pilot.  Its "new" analysis consists only of a smattering of anecdotal and conclusory statements, devoid of empirical support, from longtime critics of the exchanges' fee-and-rebate model, as well as inapposite and unsupported analogies to the fees supposedly charged by

5

off-exchange venues.  These tendentious submissions and inapt comparisons do not supply the data and other hard evidence that the Commission acknowledged were missing when it adopted the Fee Pilot for the purpose of developing the necessary "empirical evidence."  84 Fed. Reg. at 5242.

For each of these reasons, the Court should vacate the Commission's amendments to the access-fee cap in Rule 610(c), which risk destabilizing the securities market.  It should also vacate the amendments to Rule 612—which adopt a new sub-penny pricing increment for securities—because the Commission has taken the position that the sub-penny pricing increment cannot be implemented without a modification to the existing 30-mils fee cap.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under Section 25(b) of the Exchange Act.  15 U.S.C. § 78y(b).  The Access-Fee Rule was issued by the Commission on September 18, 2024, and published in the Federal Register on October 8, 2024.  *See* JA_[89.Fed.Reg.81,620].  Petitioners filed a timely petition for review on October 30, 2024.

## STATEMENT OF ISSUES

1.  Whether, in promulgating the Access-Fee Rule, the Commission exceeded its statutory authority under Section 11A of the Exchange Act by imposing an

across-the-board cap on access fees charged by all national securities exchanges.

2. Whether the Commission's promulgation of the Access-Fee Rule was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Commission failed to acknowledge its recent uncertainty about the impact of reducing exchanges' fees and rebates or to provide a reasoned, evidence-based explanation for its change in position or for its decision to set the new fee cap at 10 mils.

3. Whether it would be improper to sever the minimum-pricing-increment amendments in Rule 612 from the amendments to the access-fee cap in Rule 610(c) given the Commission's position that a sub-penny pricing increment cannot be implemented without a modification to the existing access-fee cap.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the Addendum, along with a chart that provides corresponding United States Code citations for relevant sections of the Exchange Act.

## STATEMENT OF THE CASE

### A.    Regulatory Background

The U.S. equity market consists of more than a dozen national securities exchanges, including Petitioners Cboe BZX Exchange, Inc., The Nasdaq Stock

Market LLC, and their affiliated exchanges. Petitioners are registered with the Commission as national securities exchanges and are subject to its regulatory oversight.[1] *See* 15 U.S.C. § 78f. For example, when exchanges seek to introduce a new fee for a product or service, or to modify an existing fee, they are required to adopt a rule change memorializing the fee and to submit the rule to the Commission for its review. *Id.* § 78s(b). The Commission can disapprove exchange fees that are not "reasonable" and "equitab[ly] allocat[ed]." *Id.* § 78f(b)(4).

Exchanges use several different fee models. The primary approach is known as the "maker-taker" model. A trader "makes" liquidity by posting a bid to buy, or an offer to sell, a security, and another trader "takes" liquidity by selling at the bid price or buying at the offer price. JA_[89.Fed.Reg.at.81,645]. A maker-taker exchange, such as Petitioners Cboe BZX Exchange, Inc. and The Nasdaq Stock Market LLC, charges an access fee to the trader that takes the liquidity and uses a portion of the fee to pay a rebate to the trader that makes the liquidity. For example, an exchange might charge a fee of $0.003 per share for accessing a quotation and pay a rebate of $0.002 per share to encourage the posting of liquidity. In this example, the exchange's revenue would be $0.001 per share, *i.e.*, the difference between the access fee of $0.003 and the rebate of $0.002.

---

[1] Cboe Global Markets, Inc. and Nasdaq, Inc. are the exchanges' publicly traded parent companies and are not themselves exchanges.

Exchanges compete with numerous off-exchange venues, such as alternative trading systems, where traders can also buy and sell securities. 84 Fed. Reg. at 5253. Off-exchange venues are not required to register as national securities exchanges under the Exchange Act and are not subject to the same regulatory oversight as the exchanges with which they compete. JA_[89.Fed.Reg.at.81,771]. For example, off-exchange venues are not required to establish that their fees are reasonable and equitable under the Exchange Act, JA_[Nasdaq.Letter.I,at.31.(Mar.30,2023)], or to disseminate information about quotations on their platforms (leading them to be known as "dark" venues, in contrast with "lit" exchanges). In recent years, significant trading volume has moved off-exchange. Today, off-exchange venues account for at least 40% of all trading volume. JA_[Cboe.Letter.III,at.3.(Aug.23,2023)].

Rebates are a primary tool that exchanges use to compete with each other and with off-exchange venues for order flow. JA_[Cboe.Letter.IV,at.2-3.(Apr.5,2024)]. Rebates also lead to better pricing for investors by affording liquidity providers revenue that enables them to narrow spreads—the difference between the prices at which they bid to buy and offer to sell a security. JA_[Nasdaq.Letter.I,at.2.(Mar.30,2023)]. Liquidity providers can use rebates to offset the profit that they lose from narrowing their spreads. *Id.*

9

The Commission did not cap the amount of exchanges' access fees until 2005. That year, the Commission adopted Regulation NMS, which significantly altered the U.S. equity market.  70 Fed. Reg. 37,496 (June 29, 2005).  As part of that rulemaking, it adopted Rule 610(c), which set $0.003 (30 cents per 100 shares or 30 mils) as the maximum fee that an exchange can charge to execute an order against a protected quotation.  17 C.F.R. § 242.610(c); *see also id.* § 242.600(b)(82) (defining "protected quotation").  To illustrate, if the price of an offer to sell a stock is displayed at $10.00, the total cost imposed at the exchange level to access that offer (and buy the stock) would be a maximum of $10.003—which is $10.00 plus the maximum access fee of $0.003.  70 Fed. Reg. at 37,502.  In adopting its fee cap, the Commission concluded that $0.003 per share "will not seriously interfere with current business practices" as "trading centers have very few fees on their books of more than $0.003 per share."  *Id.* at 37,503. Because exchanges use access fees to fund rebates, the 30-mils cap also imposes, as a practical matter, a corresponding limitation on the amount that exchanges can offer to liquidity providers as rebates. JA_[87.Fed.Reg.at.80,288].

Taking inflation into account, the real cost of access fees has fallen by at least one-third since 2005.  JA_[Nasdaq.Letter.II,at.2-3.(Aug.9,2023)].

10

### B.      The Fee Pilot

In 2018, the Commission set out to conduct a pilot program to determine whether to alter its existing regulatory approach to access fees and rebates. Specifically, it sought to "study the effects that transaction-based fees and rebates may have on, and the effects that changes to those fees and rebates may have on, order routing behavior, execution quality, and market quality more generally." *Transaction Fee Pilot for NMS Stocks*, Release No. 34-82873, 83 Fed. Reg. 13,008, 13,008 (Mar. 26, 2018).

As the Commission explained, the "intent of the proposed pilot [was] to better understand, within the context of our current market structure, the effect of access fees on liquidity provision." 83 Fed. Reg. at 13,012. Because the Fee Pilot did not have "any certain or predetermined outcomes," *id.*, it was entirely possible that the study would show that the existing $0.003 cap remains appropriate or should even be increased or lifted altogether.

The Commission adopted the final Fee Pilot Rule in December 2018. *Transaction Fee Pilot for NMS Stocks*, Release No. 34-84875 (Dec. 18, 2018), 84 Fed. Reg. 5202 (Feb. 20, 2019). The Commission created two test groups of stocks, one with an access-fee cap of $0.001 and the other with a prohibition on rebates, and sought to compare ensuing trading data for those groups against a control group that

would continue operating under existing Commission rules. *See NYSE*, 962 F.3d at 545.

The Commission elected not to include off-exchange venues in the Fee Pilot. In so doing, it acknowledged that it "lacks data on the current pricing schedules offered by off-exchange venues," 84 Fed. Reg. at 5282, and reasoned that it would have been "exceptionally difficult to create and then impose a uniform fee regime" on off-exchange venues because they charge "idiosyncratic and individually-negotiated fees to market participants," *id.* at 5292.

The Commission reiterated that the Fee Pilot was purely an experiment, intended to gather data "to study fees and rebates that exchanges assess to broker-dealers and observe the impacts of those fees and rebates on the markets and market participants." 84 Fed. Reg. at 5244. Through the experiment, the Commission sought to produce an "exogenous shock that generates measurable responses" that could be used to make "more informed regulatory decisions" about access fees and rebates. *Id.* at 5226, 5259. Indeed, the Commission acknowledged that it "lacks information" on a range of issues implicated by exchanges' fee-and-rebate model, such as:

*Transaction costs.* The Commission intended the Pilot to assess whether, and how, transaction costs would change for investors as a result of reduced access fees. The Commission conceded that, without conducting the Pilot, it could not "predict

whether investors will face higher or lower transaction costs." 84 Fed. Reg. at 5277-78.

*Shifting order flow to off-exchange venues.* Throughout the Fee Pilot Rule, the Commission conceded that one possible outcome would be a significant diversion of order flow from securities exchanges to off-exchange venues. It hypothesized that "the distribution of trading volume could change between exchanges and off-exchange trading venues." 84 Fed. Reg. at 5282. Relatedly, the Commission expressed "uncertainty" about how a reduction in exchanges' ability to fund rebates would affect liquidity and acknowledged that the Pilot "could result in a positive, negative, or neutral change in liquidity for the stocks in test groups." *Id.* at 5276.

*Conflicts of interest.* The Commission was "not certain of the extent to which some broker-dealers route investor orders to avoid fees or to capture rebates in such a way that reduces execution quality." 84 Fed. Reg. at 5277-78. The Fee Pilot was intended to "study such conflicts of interest." *Id.*

Multiple securities exchanges filed petitions for review challenging the Fee Pilot Rule. This Court granted the petitions and vacated the rule, concluding that the Commission exceeded its statutory authority in adopting the Pilot. *NYSE*, 962 F.3d at 559. As this Court explained, "an agency's general rulemaking authority does not

13

mean that the specific rule the agency promulgates is a valid exercise of that authority." *Id.* at 546.

According to the Court, the Commission adopted the Fee Pilot Rule without first demonstrating that access fees constituted "a problem worthy of regulation." *NYSE*, 962 F.3d at 545. Certainly, there had been a "debate" about "whether the fee cap remains appropriate." *Id.* at 548. But the Fee Pilot imposed "significant, costly, and disparate regulatory requirements" without any showing by the Commission that the experiment would "rectify" any "problems with *existing* regulatory requirements," including the existing 30-mils fee cap. *Id.* at 545-46 (emphasis added). This Court emphasized that the Commission had "taken no position on the conflicting views expressed by members of the regulated community" and had "no real idea whether the data collected will be useful or to what end." *Id.* at 555. "Nothing in the Exchange Act," the Court concluded, "gives the Commission authority to follow this aimless regulatory approach." *Id.*

### C.    Proposed Access-Fee Rule

Undeterred by its inability to gather the empirical data that it previously deemed necessary to make "informed regulatory decisions," 84 Fed. Reg. at 5259, the Commission published a Notice of Proposed Rulemaking ("Proposed Rule") in December 2022 that proposed moving forward with the fee-cap reduction that it had planned to test in the Pilot. JA_[87.Fed.Reg.80,266]. Specifically, the Commission

14

proposed:  (1) for executions against protected quotations priced $1.00 or more, a fee cap of $0.001 (10 mils) for stocks assigned, under the proposal's new pricing increments, a minimum pricing increment larger than $0.001, and a fee cap of $0.0005 (5 mils) for stocks assigned a $0.001 minimum pricing increment; and (2) for protected quotations priced under $1.00 per share, a fee cap of 0.05% of the quotation price.  JA_[87.Fed.Reg.at.80,269-70].  The Proposed Rule also included other measures, including pricing securities at several increments below the current minimum pricing increment of $0.01 and requiring exchanges to make the amounts of fees and rebates determinable "at the time of execution." JA_[87.Fed.Reg.at.80,270].

Notably, the Proposed Rule did not acknowledge the Commission's prior uncertainty in the Fee Pilot Rule about the market impact of exchanges' existing fee-and-rebate model or its avowed need for additional data before deciding whether regulatory reform was warranted.  In fact, just two years removed from this Court's decision invalidating the Fee Pilot Rule, the Commission did not even cite the opinion in the Proposed Rule.

In response to its proposal, the Commission received hundreds of comments. For example, Nasdaq submitted letters explaining why rebates are indispensable when it comes to exchanges' ability to attract liquidity, JA_[Nasdaq.Letter.I,at.19-25.(Mar.30,2023)], and that the Proposed Rule would "fail[] to heed the lessons of

the Transaction Fee Pilot," JA_[Nasdaq.Letter.I,at.26.(Mar.30,2023)].  Nasdaq also raised "significant concerns regarding the statutory authority of the Commission to engage in ratemaking," JA_[Nasdaq.Letter.VI,at.1.(Aug.7,2024)], and submitted research rebutting other commenters' contentions that (i) access fees are excessive and (ii) alternative trading systems are valid comparators when setting a proper fee cap for exchanges, JA_[Nasdaq.Letter.IV,at.2-5.(Mar.25,2024)]; JA_[Nasdaq.Letter.V.(May.7,2024)].  Cboe also submitted several letters, including one debunking myths about access fees, such as that (i) technological advances justify decreasing fees, (ii) fees create conflicts of interest, and (iii) lower fees would improve competition.  JA_[Cboe.Letter.III,at.5-8.(Aug.23,2023)].

### D.    Final Access-Fee Rule

The Commission published its final rule in October 2024. JA_[89.Fed.Reg.81,620].  In the final Access-Fee Rule, the Commission pressed ahead with a dramatic reduction in the longstanding 30-mils access-fee cap, modifying its proposal slightly to establish two caps:  (1) a 10-mils access-fee cap for all protected quotations priced $1.00 or more, and (2) a fee cap of 0.1% for protected quotations priced less than $1.00.

The Commission declared that it had authority under Section 11A(c)(1)(B) of the Exchange Act, 15 U.S.C. § 78k-1(c)(1)(B), to impose the fee-cap reduction. JA_[89.Fed.Reg.at.81,655].  That provision "authorizes the Commission to adopt

16

rules assuring the fairness and usefulness of quotation information"; even though it makes no mention of fees, the Commission deemed it sufficient because "Congress granted the Commission broad authority to oversee the national market system and ensure that it is meeting the investment needs of the public." JA_[89.Fed.Reg.at.81,655-56].

Like the Proposed Rule, the final Access-Fee Rule does not mention this Court's decision invalidating the Fee Pilot Rule. Nor does it acknowledge the uncertainty about exchanges' fees and rebates that prompted the Commission to propose the Pilot or explain how the Commission was able to resolve that uncertainty without conducting the Pilot. Indeed, the Commission purported to reach a definitive conclusion in the Access-Fee Rule on many of the same issues as to which it expressed uncertainty and the need for more data in the Fee Pilot Rule, including:

***Transaction costs.*** The Commission had hoped the Fee Pilot would "illuminate the extent to which the current fees and rebates affect the market and the extent to which those effects have a detrimental impact on investor transaction costs." 84 Fed. Reg. at 5218. In the Access-Fee Rule, by contrast, the Commission definitively concluded that "lowering the access fee cap *will result* in lower transaction costs for investors." JA_[89.Fed.Reg.at.81,732] (emphasis added). But the Commission failed to provide any actual evidence to support its speculative contention.

***Shifting order flow to off-exchange venues.***  The Commission conceded in the Fee Pilot that it "cannot ex ante predict the effects of the Pilot on . . . competition between exchanges and off-exchange trading venues for order flow" and "acknowledge[d] that the distribution of trading volume could change between exchanges and off-exchange trading venues." 84 Fed. Reg. at 5281-82.  In the Access-Fee Rule, however, the Commission took the position that the Rule's reduced access-fee caps might actually *increase* on-exchange trading volume. According to the Commission, "it is unlikely that significant activity will be driven off-exchange," and, in fact, "it is possible that activity may come *on*-exchange as a result of the lower access fee cap."  JA_[89.Fed.Reg.at.81,762] (emphasis added). Relatedly, despite the Commission's "uncertainty" about the Fee Pilot's effect on liquidity, 84 Fed. Reg. at 5276, the Commission "disagree[d]" in the Access-Fee Rule that "rebates are essential to attract liquidity" and found that liquidity providers will "not be deterred from quoting on exchange," JA_[89.Fed.at.81,656-57].

***Conflicts of interest.***  In the Fee Pilot, the Commission included a "no-rebate Test Group" "designed to test the extent to which transaction fees and rebates create conflicts of interest that influence order routing."  84 Fed. Reg. at 5222.  By contrast, in the Access-Fee Rule, the Commission found that "the lower access fee cap is . . . expected to reduce broker-dealer conflicts of interest."  JA_[89.Fed.Reg.at.81,756].

18

Based on a combination of stale evidence and sheer conjecture, the Commission somehow concluded that reducing the access-fee cap "will benefit investors and market participants." JA_[89.Fed.Reg.at.81,621]. It set 10 mils as the new fee cap for transactions in securities priced $1.00 or more—a two-thirds reduction of the 30-mils cap in place since 2005—because it believed that the new cap would "be consistent with the access fees charged by" alternative trading systems. JA_[89.Fed.Reg.at.81,661]. The Commission did so even though it had found in the Fee Pilot Rule that the fees charged by alternative trading systems are "bespoke, typically bundled, and . . . not as transparent as exchange fees." 84 Fed. Reg. at 5206.

In addition to amending the fee cap in Rule 610(c), the Commission finalized its proposal to amend Rule 610(d) to require exchanges' fees and rebates to be determinable at the time a trade is executed. JA_[89.Fed.Reg.at.81,624]. The Commission also adopted its proposal to amend Rule 612 to introduce a new sub-penny pricing increment of $0.005 for quotes and orders priced $1.00 or more for stocks that have a "time weighted average quoted spread" of $0.015 or less. JA_[89.Fed.Reg.at.81,623]. As the Commission explained, the amendments to Rule 610(c) and Rule 612 work in tandem. *See* JA_[89.Fed.Reg.at.81,682] ("Absent a reduction in the maximum access fee, a round-trip buy and sell for stocks quoted at the new half-penny tick would require paying more in fees (0.60 cents) than in the

19

spread itself (0.50 cents)").  The amendment to Rule 610 is therefore meant "to accommodate" the new "smaller minimum pricing increments under . . . Rule 612." JA_[89.Fed.Reg.at.81,624].

Finally, the Commission committed that by May 2029, its "staff will review and study the effects of the amendments."  JA_[89.Fed.Reg.at.81,703].  "Such a review and study might include, but would not be limited to, an investigation of . . . the reaction of quoted spreads to the implementation of the amended access fee cap and . . . changes to where market participants direct order flow, e.g., to exchange versus off-exchange venues, following the implementation of the amendments." JA_[*Id.*].

### E.    Procedural History

Petitioners filed a timely petition for review.  They thereafter moved the Commission for a stay of the amendments to Rule 610(c) adopting a reduced access-fee cap and Rule 612 adopting a new sub-penny pricing increment pending resolution of these proceedings.  The Commission granted a stay.  *In re Mot. for Stay of Effect of Amends. to Rules 610 & 612 of Regul. NMS*, Release No. 34-101899, File No. S7-30-22, 2024 WL 5094955 (Dec. 12, 2024).

## STANDARD OF REVIEW

The APA requires courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A). An agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In addition, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position" and show that "there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515.

## SUMMARY OF ARGUMENT

For multiple reasons, the Court should vacate the amendments to Rule 610(c) and Rule 612.

**I.** The Access-Fee Rule exceeds the Commission's statutory authority under the Exchange Act, which does not authorize the Commission to set an across-the-board access-fee cap. The Commission relied on Section 11A(c)(1)(B) of the Exchange Act to impose its new 10-mils cap on all exchanges. 15 U.S.C. § 78k-1(c)(1)(B). The plain language of that provision makes no mention of fees. By contrast, Section 6(b)(4) of the Exchange Act specifically requires that "[t]he rules of the exchange provide for the equitable allocation of reasonable . . . fees," *id.* § 78f(b)(4), and Section 19 of the Exchange Act authorizes the Commission to

review (and approve or disapprove) exchanges' rules proposing new fees and to adopt new rules on behalf of an exchange, *id.* § 78s.

Accordingly, if the Commission chooses to regulate access fees, it must proceed on a case-by-case basis under Section 19—either by disapproving proposed fees as inconsistent with Section 6(b)(4) or amending an exchange's rulebook to establish a new access fee. The Commission's imposition of an across-the-board access-fee cap on all exchanges under Section 11A(c)(1)(B) ignores Congress's deliberate decision to omit "fees" from that provision and undermines the carefully delineated procedural framework it adopted in Section 19 for the regulation of exchange fees on an individualized basis. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023).

**II.** The Access-Fee Rule is arbitrary and capricious because the Commission failed to acknowledge its prior uncertainty about the market impact of a reduction in exchanges' fees and rebates or to provide a reasoned, evidence-based explanation for its new position that a 10-mils fee cap and corresponding reduction in rebates would benefit investors.

In 2018, the Commission announced the Fee Pilot "to study fees and rebates that exchanges assess to broker-dealers and observe the impacts of those fees and rebates on the markets and market participants." 84 Fed. Reg. at 5244. When adopting the Fee Pilot Rule, the Commission specifically disclaimed any

22

understanding of whether (i) a reduced access-fee cap would decrease (or increase) transaction costs, (ii) a reduced fee cap would divert order flow to off-exchange venues, and (iii) rebates funded by access fees cause conflicts of interest. This Court prevented that statutorily unauthorized experiment from going forward. Nevertheless, the Commission has now adopted the *same* fee-cap reduction that it proposed to study in the Fee Pilot—declaring definitively in the Access-Fee Rule that the new 10-mils fee cap "*will* benefit investors and market participants." JA_[89.Fed.Reg.at.81,621] (emphasis added). But the Commission failed to acknowledge its recent uncertainty on these very issues, which is a sufficient reason, standing alone, to vacate the Rule. *See Fox Television Stations*, 556 U.S. at 515.

Nor did the Commission identify concrete evidence, post-dating the Fee Pilot Rule, that could explain its newfound confidence on issues that were recently the source of such profound uncertainty for the Commission. Rather than point to new empirical evidence, the Commission rehashed much of the same stale evidence it presented in the Fee Pilot—evidence that the Commission itself deemed inadequate to establish that access fees and rebates are harmful. To the extent that the Commission purported to present new evidence in the current Rule, it relied on anecdotal material submitted by longtime critics of the exchanges' fee-and-rebate model—without discharging its obligation to scrutinize that evidence independently. *See Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). And

the Commission failed to explain why proceeding with a drastic reduction in the fee cap is warranted now when other regulatory measures—such as the transparency-enhancing provisions of the Access-Fee Rule—could address the perceived problems identified by the Commission.

Finally, even if some reduction in the fee cap could be justified, the Commission failed to identify evidence supporting its specific imposition of a 10-mils cap that reduced the longstanding cap by *two-thirds*.  The Commission premised this steep cut on comment letters contending—without empirical evidence—that off-exchange venues are a valid comparator for securities exchanges and do not charge access fees in excess of 10 mils.  In so doing, the Commission overlooked the critical differences between off-exchange venues and exchanges, and ignored evidence (including the Commission's own prior statements) contradicting the conclusion that off-exchange venues do not charge fees that exceed 10 mils.

Because the Commission's adoption of a 10-mils fee cap in Rule 610(c) exceeds the Commission's statutory authority and is arbitrary and capricious, this Court should vacate the amendments to Rule 610(c) as well as the new sub-penny minimum-pricing increment in Rule 612, which the Commission acknowledges is unworkable in the absence of the fee-cap reduction.

24

## STANDING

Petitioners have standing because, as national securities exchanges, they are the direct targets of the Access-Fee Rule, which reduces by two-thirds the Commission-imposed cap on access fees that Petitioners can charge for execution against protected quotations. As "regulated parties," Petitioners satisfy the "irreducible constitutional minimum of Article III standing." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286-87 (D.C. Cir. 2005) (internal quotation marks omitted).

## ARGUMENT

### I.    THE COMMISSION LACKS STATUTORY AUTHORITY TO SET AN ACROSS-THE-BOARD ACCESS-FEE CAP.

The threshold question in any challenge to agency action is whether the agency had statutory authority to act. *See*, *e.g.*, *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 404 (D.C. Cir. 2023). This Court vacated the Commission's Fee Pilot Rule precisely because the Commission lacked statutory authority to "impose significant, costly, and disparate regulatory requirements" merely to see "whether there is a problem worthy of regulation." *NYSE*, 962 F.3d at 554-55. The Access-Fee Rule is equally flawed because the Commission premised the Rule on a provision of the Exchange Act that does not authorize the Commission to regulate exchange fees.

25

**A.** To impose its new, across-the-board access-fee cap, the Commission invoked Section 11A(c)(1)(B) of the Exchange Act, which authorizes the Commission to "assure the prompt, accurate, reliable, and fair collection, processing, distribution, and publication of information with respect to quotations for and transactions in . . . securities and the fairness and usefulness of the form and content of such information." 15 U.S.C. § 78k-1(c)(1)(B); *see also* JA_[89.Fed.Reg.at.81,655]. Section 11A(c)(1)(B) does not authorize the Commission to regulate exchange fees.

Statutory interpretation begins with the text. *Eagle Pharm. v. Azar*, 952 F.3d 323, 331 (D.C. Cir. 2020). Section 11A(c)(1)(B) does not mention fees at all. Rather, it authorizes the Commission to regulate "*information*" with respect to "quotations" and to ensure the "fairness and usefulness" of such "*information*." 15 U.S.C. § 78k-1(c)(1)(B) (emphases added). Congress knows how to grant regulatory authority with respect to "fees" when it wants to, including in other provisions of the Exchange Act, but it elected not to do so in Section 11A(c)(1)(B). *See*, *e.g.*, 15 U.S.C. § 78ee(a) ("The Commission shall, in accordance with this section, collect transaction *fees* and assessments") (emphasis added); *id.* § 78f(b)(4) (exchange rules must "provide for the equitable allocation of . . . *fees*") (emphasis added).

26

Moreover, the Commission must show not only that "information" means "access fees," but also that the statute empowers the Commission to impose a cap on those fees. But nothing in Section 11A(c)(1)(B) authorizes the Commission to regulate the *amount* of fees. When Congress intended to authorize the Commission to override fees set by an exchange, it did so explicitly. *See*, *e.g.*, 15 U.S.C. § 78f(e)(2) ("the Commission, by rule, may *abrogate* any exchange rule which imposes a schedule or fixes rates of commissions, allowances, discounts, or other *fees*, if the Commission determines that such schedule or fixed rates are no longer reasonable") (emphases added). The Commission's decision not to include similar language in Section 11A(c)(1)(B) is dispositive. *See Bartenwerfer*, 598 U.S. at 78 ("when Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate") (alterations and internal quotation marks omitted).

Authorizing the Commission to invoke Section 11A(c)(1)(B) to impose an across-the-board fee cap on all exchanges would upend the carefully crafted congressional design embodied in the structure of the Exchange Act, which provides for individualized Commission review of exchange fees. Section 6(b) of the Exchange Act specifically authorizes the Commission to ensure that the rules of an exchange "provide for the equitable allocation of reasonable dues, fees, and other charges." 15 U.S.C. § 78f(b)(4). In Section 19 of the Exchange Act, Congress

27

provided a detailed set of procedures that the Commission must follow when applying the substantive standard of Section 6(b) to exchange fees. *Id.* § 78s. In particular, Section 19(b) authorizes the Commission to review individual exchanges' proposed fee rules for consistency with Section 6(b) and specifies detailed procedures for that review. *Id.* § 78s(b).

For example, under Section 19(b)(2), the Commission must "approve or disapprove" a proposed rule change within 45 days after the date of publication or "institute proceedings . . . to determine whether the proposed rule change should be disapproved," which, in turn, triggers another set of procedures and deadlines. 15 U.S.C. § 78s(b)(2). The Commission and its staff regularly deploy these procedures to review exchanges' fee proposals. *See*, *e.g.*, *Order Disapproving Proposed Rule Change to Increase Fees for Certain Market Data and Connectivity Products*, 89 Fed. Reg. 95,822 (Dec. 3, 2024) (disapproving fee rule). Section 19(b)(3) authorizes exchanges to designate fee changes as immediately effective and empowers the Commission to temporarily suspend, and institute proceedings regarding, such rule changes. 15 U.S.C. § 78s(b)(3). And Section 19(c) further provides that the "Commission, by rule, may abrogate, add to, and delete from" exchanges' existing rules, pursuant to a procedure that requires the Commission, among other things, to provide notice to the exchange and publish the text of the proposed amendment for notice and comment. *Id.* § 78s(c).

The Commission did not follow any of these procedures here. Instead, it disregarded Section 19 altogether and invoked Section 11A(c)(1)(B) to impose an across-the-board 10-mils fee cap on all exchanges—without undertaking an individualized review of a proposed exchange fee or an individualized assessment of whether to modify an exchange's existing fee rules under Section 19. But Congress put those particularized procedures in place for a reason. As Congress emphasized when establishing the national market system, the Commission neither has the "responsibility" nor the "power" to "operate as an 'economic czar'" with pervasive control over the securities market, which "depend[s] upon the vigor of competition" among "private interests." S. Rep. No. 94-75, at 12 (Apr. 14, 1975). Yet, that is precisely what the Commission did here by ignoring the circumscribed procedures specified in Section 19 in favor of imposing an across-the-board fee cap under Section 11A(c)(1)(B). The Commission's action eviscerates the carefully delineated procedures of Section 19, which are the congressionally specified mechanism for the Commission to enforce the substantive requirements that Section 6 imposes on exchange fees.

**B.** In promulgating the Access-Fee Rule, the Commission did not contend that Section 11A(c)(1)(B) provides explicit statutory authority to impose a fee cap. The Commission instead claimed "'broad authority to oversee . . . the national market system'" pursuant to legislative history addressing the generalized language

29

of Section 11A. JA_[89.Fed.Reg.at.81,656] (quoting S. Rep. No. 94-75, at 8-9). After *Loper Bright*, however, agencies cannot claim statutory powers absent clear congressional authorization. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). And, rather than deferring to agencies' construction of statutory language, courts must exercise their own independent judgment in deciding whether an agency has acted within its statutory authority. *Id.* at 2273. Moreover, even before *Loper Bright*, an agency could not rely on legislative history to override the plain language and structure of a statute, *see Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021)—especially where, as here, that legislative history elsewhere contradicts the agency's vast power grab, *see supra* pg. 28-29.

Those interpretive principles are dispositive in this case. The text and structure of the Exchange Act unequivocally establish that the Commission's authority to regulate exchanges' fees is limited to enforcing the substantive standards of Section 6 through the individualized rule-review and rule-modification procedures of Section 19. Construing Section 11A(c)(1)(B) to provide an alternative basis for the Commission to regulate exchanges' fees would enable an end-run around the particularized procedures of Section 19. *See Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions").[2]

Because the Commission did not impose the 10-mils fee cap pursuant to the procedures of Section 19 and because Section 11A(c)(1)(B) does not authorize the Commission to impose a fee cap on all exchanges, the Access-Fee Rule exceeds the Commission's statutory authority.

## II.    THE COMMISSION'S ADOPTION OF A 10-MILS ACCESS-FEE CAP IS ARBITRARY AND CAPRICIOUS.

The Access-Fee Rule's two-thirds reduction of the longstanding 30-mils fee cap also is arbitrary and capricious. First, the Commission entirely ignored its prior uncertainty about the market impact of reducing exchanges' fees and rebates— which was the impetus for the Fee Pilot experiment vacated by this Court and which the Commission was required to acknowledge before adopting its newfound position in the Access-Fee Rule. Second, the Commission failed to provide a reasoned explanation—based on evidence it developed after the failed Fee Pilot—for concluding that a reduction in exchanges' fees and rebates would benefit investors

---

[2] Nor could the Commission draw support from the fact that the 30-mils fee cap has been on the books and gone unchallenged since 2005. As this Court has emphasized, "publication in the C.F.R. is no measure of an agency's authority to issue rules that appear there." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024); *see also Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) ("A regulation's age is no antidote to clear inconsistency with a statute.") (citation omitted).

and the market.  The reasoning that the Commission did provide was based on evidence previously presented in the Fee Pilot rulemaking, as well as representations in comment letters that it failed independently to verify.  The Commission's reasoning, moreover, was plagued by internal inconsistencies and a failure to account for alternatives to this drastic regulatory intervention.  Finally, the Commission failed to justify its selection of a 10-mils fee cap, rather than a less substantial reduction in the two-decade-old 30-mils cap.

### A. The Commission Failed To Acknowledge Its Prior Uncertainty About The Market Impact Of Exchanges' Fees And Rebates.

The Access-Fee Rule is arbitrary and capricious because the Commission failed to grapple with its recent uncertainty about how reducing access fees—and thus also reducing the rebates funded by those fees—would affect market dynamics. In fact, the Commission entirely ignored that, just a few years ago, it admitted in the Fee Pilot Rule that it lacked the evidence necessary to reach a conclusion either way on these complicated, sharply debated questions.

When an agency changes its position on an issue, the agency must "at least 'display awareness that it *is* changing position' and 'show that there are good reasons for the new policy.'"  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017) (quoting *Fox Television Stations*, 556 U.S. at 515).  Failure to recognize a change in position renders the new rule arbitrary and capricious.  *See*, *e.g.*, *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir.

2023) (vacating where the agency "did not acknowledge—much less justify—its adoption of a new rule").

In 2018, the Commission acknowledged in the Fee Pilot Rule that there was a "lack of data" regarding how exchange fees and rebates affect the market. 84 Fed. Reg. at 5214. It was for exactly that reason that the Commission sought to undertake the Fee Pilot, which would have delivered an "exogenous shock" to the securities market in an effort to generate information that could be used to make "more informed regulatory decisions." *Id.* at 5203, 5214, 5259. That uncertainty was centered on three key areas: (1) whether a reduction in access fees would reduce (or increase) transaction costs, *see id.* at 5277 (the Commission "cannot predict whether investors will face higher or lower transaction costs" due to the Fee Pilot); (2) whether a reduction in access fees would divert order flow to off-exchange venues; *see id.* at 5282 ("the Commission believes that the overall effects of the Pilot on this competition are unclear, because . . . there are reasons why the Pilot may temporarily increase as well as decrease the order flow routed to off-exchange trading venues"); and (3) whether there is a potential conflict of interest affecting broker-dealers' order-routing decisions that a reduction in access fees would ameliorate, *see also id.* at 5244 (acknowledging a "lack of empirical evidence regarding the potential conflicts of interest"). This Court's decision vacating the Fee Pilot Rule prevented

the Commission from undertaking its experimental data-gathering exercise.  *See NYSE*, 962 F.3d at 559.

Yet, in the Access-Fee Rule, the Commission nevertheless took the definitive position that imposing a sweeping two-thirds reduction in the access-fee cap "*will* benefit investors and market participants."  JA_[89.Fed.Reg.at.81,621] (emphasis added).  It did so without acknowledging that, less than six years earlier, it was unable to reach a conclusion on that very question (while relying upon much of the same body of evidence).[3]  The Commission's unacknowledged about-face was arbitrary and capricious.  *See Am. Wild Horse Preservation Campaign*, 873 F.3d at 928.

In fact, the Access-Fee Rule itself silently concedes the Commission's lingering doubts about whether a reduction in the access-fee cap is warranted. Despite the Commission's adoption of the new cap and its failure to acknowledge its prior uncertainty, it still committed to "review and study the effects of the amendments" by May 2029, JA_[89.Fed.Reg.at.81,703]—confirming that, in many respects, the Access-Fee Rule is nothing more than a warmed-over rehash of the Fee Pilot experiment shorn of the candid concessions of uncertainty that prompted this

---

[3] For example, the Commission repeatedly relied in the Access-Fee Rule on comment letters that were submitted in 2018 as part of the Fee Pilot rulemaking. *See*, *e.g.*, JA_[89.Fed.Reg.at.81,645.n.364] (citing comment letters from 2018 and earlier sources); JA_[*id.*at.81,649.n.410] (citing 2018 Goldman letter).

Court to invalidate the Pilot.  The Commission apparently decided to move forward with its data-gathering exercise by simply deleting the Fee Pilot Rule's dozens of references to "uncertainty" and replacing them with unsubstantiated declarations that the fee-cap reduction will *actually* benefit investors and the market.

Indeed, in many ways, the Access-Fee Rule is even more pernicious than the Fee Pilot experiment.  Unlike the Fee Pilot Rule, the Access-Fee Rule is *permanent* and reduces access fees for transactions in *all* securities traded on exchanges, rather than a subset.  And while the Fee Pilot Rule sought to gather data that the Commission could have used to make more informed regulatory decisions in the future, the Commission has now decided to follow the opposite course.  The Fee Pilot sought to (1) study the consequences of temporarily reduced access fees and rebates and (2) then determine, based on the data generated by that experiment, whether the access-fee cap should be permanently reduced.  The Access-Fee Rule, by contrast, (1) permanently reduces the access-fee cap now and (2) will only study the consequences years from now.  Although the Fee Pilot exceeded the Commission's statutory authority and was a solution in search of a problem, it made far more practical sense than the Access-Fee Rule's regulate-now-study-later approach.

35

The Commission's unacknowledged and unexplained change in position is reason enough to vacate the Access-Fee Rule. *See Fox Television Stations*, 556 U.S. at 515.

> **B.    The Commission Failed To Provide A Reasoned Explanation For Its Newfound Confidence About The Impact Of A Dramatic Access-Fee Cap Reduction.**

In addition to acknowledging a change in position, an agency must provide a "reasoned explanation" for why its new position is preferable to its old one. *Am. Wild Horse Preservation Campaign*, 873 F.3d at 923; *see Prohibition Juice Co. v. U.S. FDA*, 45 F.4th 8, 20 (D.C. Cir. 2022) ("Agencies must explain changes in position, particularly once a prior position has engendered regulated parties' reliance."). And, like any agency action, the new position must be supported by evidence that establishes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In the Access-Fee Rule, however, the Commission failed to provide a reasoned, evidence-based explanation for its confidence that the reduced fee cap will benefit investors and the market.

> **1.    Transaction Costs**

The Commission silently pivoted from uncertainty to definitiveness on whether a reduction in access fees would reduce or increase transaction costs for investors. In the Fee Pilot Rule, the Commission admitted that it could not "predict whether investors will face higher or lower transaction costs in th[e] new

equilibrium" created by the Pilot's reduced fees and rebates.  84 Fed. Reg. at 5277.

The Fee Pilot was designed to "gather data to facilitate an empirical assessment of

the effect of exchange transaction fees and rebates" on investors' costs.  *Id.* at 5204.

Even though the Fee Pilot was never implemented, the Commission declared

unequivocally in the Access-Fee Rule that the "adopted amendments to Rule 610

*will* lower costs for investors and other market participants," without mentioning its

recent uncertainty on this issue.  JA_[89.Fed.Reg.at.81,629] (emphasis added).

In addition to failing to "display awareness" of its change in position, *Fox

Television Stations*, 556 U.S. at 515; *see supra* Part II.A, the Commission failed to

provide a "reasoned explanation" for its conclusion that a reduction in access fees

will result in lower costs for investors, *Am. Wild Horse Preservation Campaign*, 873

F.3d at 923.  Indeed, the Commission failed to grapple with its own reasoning in the

Fee Pilot Rule as to why lowering access fees—and, as a result, rebates—could

actually *increase* transaction costs.  In the Fee Pilot Rule, the Commission explained,

for example, that "the cost of transacting" could increase if "the reduction of rebates

leads to a reduction in quoted depth."  84 Fed. Reg. at 5277.  Similarly, it recognized

the potential for "an increase in transaction costs for [exchange traded products]"—

which track an underlying security or index—"and particularly less active" exchange

traded products.  *Id.*  The Commission did not explain why those concerns—which

prompted the Commission to develop its data-gathering Fee Pilot in 2018—no longer had salience in 2024.

The Commission's newfound position on transaction costs is also inconsistent with its own conclusion—in the Access-Fee Rule itself—that spreads will widen because of a reduction in rebates. The Commission specifically acknowledged that "quoted spreads . . . are likely to be wider because liquidity providers would be expected to widen spreads to compensate for the lower rebates." JA_[89.Fed.Reg.at.81,736]. Those wider spreads—which mean that investors will be paying more when buying securities and receiving less when selling securities—could cost investors between $1 billion and $4 billion per year in additional costs. 84 Fed. Reg. at 5278 & n.836 (citing NYSE Letter, at 13); *see also* JA_[Nasdaq.Letter.I,at.23.(Mar.30,2023)] ("average spreads on exchanges that offer rebates are significantly less than those that do not").

The Commission cannot "have it both ways" by, on the one hand, contending that the Access-Fee Rule will decrease transaction costs, while, on the other, conceding that spreads will widen—which, by definition, increases costs for investors. *Chamber of Com. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023). "It is illogical for the [R]ule simultaneously to accept and to reject . . . reasoning." *Id.*

38

### 2.    Shifting Order Flow To Off-Exchange Trading Venues

In the Fee Pilot Rule, the Commission acknowledged that, as a result of the rule's restrictions on access fees and rebates, "the distribution of trading volume could change between exchanges and off-exchange trading venues" and declared that it was "unable to predict the overall effect that changes in liquidity caused by the [Rule] will have on the competition for marketable order flow."  84 Fed. Reg. at 5282-83.  According to the Commission, the Fee Pilot was necessary to gather data that could shed light on this issue.  *See id.* at 5227 (identifying one of the questions to be studied by the Pilot as:  "What impact do lower access fees and rebates have on the amount of displayed and non-displayed liquidity on exchanges?").

The Commission reversed course in adopting the Access-Fee Rule, concluding that "it is unlikely that significant activity will be driven off-exchange." JA_[89.Fed.Reg.at.81,762].  In fact, it speculated that "activity may come *on*-exchange as a result of the lower access fee cap."  JA_[*Id.*] (emphasis added).

The Commission did not acknowledge that it had recently declared itself unable to make exactly that prediction and had planned to implement a pilot program to study that precise issue.  *See supra* Part II.A.  Beyond that threshold defect, it also failed for multiple reasons to provide a reasoned explanation, supported by concrete evidence, as to why its new position is the better one.  *See Am. Wild Horse Preservation Campaign*, 873 F.3d at 923.

39

*First*, the Commission supported its assessment of competition in the Access-Fee Rule with naked speculation.  Because the Commission conceded that, at the time of the Fee Pilot Rule, it did not know whether a fee-cap reduction would drive significant activity off-exchange, it needed to support its newfound confidence on this issue with evidence postdating the Fee Pilot.  But the Commission merely hypothesized that it is "*unlikely* that significant activity will be driven off-exchange" and that it is "*possible* that activity may come on-exchange." JA_[89.Fed.Reg.at.81,762] (emphases added).  The Commission attempted to support its conjecture with theoretical supply-and-demand analysis, JA_[89.Fed.Reg.at.81,687], but that was merely an academic exercise attempting to predict market behavior without concrete data—the type of data that the Commission set out to generate in the Fee Pilot—to substantiate the Commission's projections.  The Commission's theoretical assessment of what is "unlikely" to happen does not constitute a reasoned explanation for its new position.  *See Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 708-09 (D.C. Cir. 2014) (an agency's predictive judgments "must be based on some logic and evidence, not sheer speculation") (internal quotation marks omitted).

*Second*, in venturing these guesses, the Commission minimized empirical evidence substantiating the competitive harm that a fee-cap reduction would inflict on exchanges.  *See*, *e.g.*, JA_[Nasdaq.Letter.I,at.19-21.(Mar.30,2023)],

40

JA_[Cboe.LetterII,at.8-10(Mar.31,2023)];    JA_[Cboe.LetterIII,at.4-8(Aug.23,2023)].    Commenters explained that access-fee-funded rebates are necessary to enable exchanges to compete for order flow because off-exchange venues operate without many of the same regulatory constraints as exchanges. JA_[Cboe.Letter.III,at.8-9.(Aug.23,2023)].

For example, off-exchange venues generally have greater flexibility than exchanges in determining the pricing increments in which they execute transactions, JA_[Nasdaq.Letter.I,at.35-36.(Mar.30,2023)], and, unlike exchanges, they can quickly amend their fee schedules without Commission review, JA_[Cboe.Letter.III,at.7-8.(Aug.23,2023)].    The rebates that exchanges offer to liquidity providers mitigate some of the regulatory disparities between exchanges and off-exchange venues, but the Access-Fee Rule would greatly restrict exchanges' ability to use that tool.    JA_[Cboe.Letter.III,at.7-8.(Aug.23,2023)].    The Commission failed adequately to address this record evidence, dismissing the exchanges' concerns on the conclusory ground that "the access fee caps were not established to support trading centers' ability to offer rebates or to ensure a particular level of rebate payment."  JA_[89.Fed.Reg.at.81,656].

*Third*, in premising its competition analysis on an analogy between the new fee cap and the fees charged by alternative trading systems, the Commission ignored evidence highlighting fundamental differences between these trading platforms.  In

41

response to commenters' concerns that reducing the access-fee cap will erode liquidity on exchanges, the Commission relied on a comment letter from IEX—an exchange competitor of Petitioners that is a longtime critic of the prevailing fee-and-rebate model—contending that the new fee cap "will bring the access fees exchanges charge to remove liquidity in line with the rates charged by" alternative trading systems. JA_[89.Fed.Reg.at.81,661&n.658].

But the record makes clear that there are fundamental differences between alternative trading systems and exchanges that make the comparison entirely inapt, as well as an absence of record evidence that alternative trading systems actually charge execution fees of approximately 10 mils. *See infra* Part II.C (discussing record). The Commission's failure to address these material distinctions between exchanges and alternative trading systems, and its decision to proceed in the absence of evidence that the fees charged by alternative trading systems are in line with a 10-mils cap, were arbitrary and capricious. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("an agency cannot ignore evidence that undercuts its judgment").

### 3. Conflicts Of Interest

Finally, the Commission also failed to provide a reasoned explanation for its change in position regarding conflicts of interest allegedly attributable to exchanges' fees and rebates. The Fee Pilot experiment was "designed to *test the extent* to which

transaction fees and rebates create conflicts of interest that influence order routing or introduce distortions that impede execution quality and market quality." 84 Fed. Reg. at 5222 (emphasis added). Indeed, the Commission stated it was "not certain of the extent to which some broker-dealers route investor orders to avoid fees or to capture rebates in such a way that reduces execution quality." *Id.* at 5277-78. It therefore sought to "isolate" the issue of rebates to determine what "effects they may have." *Id.* at 5222.

The Access-Fee Rule strikes an entirely different tone. Without gathering the empirical evidence that the Fee Pilot was designed to generate, the Commission nevertheless declared that "[t]here are . . . significant reasons to believe that rebates present a conflict of interest to agency brokers" because "the quality of the execution accrues to the customer while the rebate accrues to the broker, which leads to a clear divergence of interests whenever the best rebate and the highest quality execution opportunities differ." JA_[89.Fed.Reg.at.81,742].

In addition to failing to acknowledge the uncertainty that prompted the Fee Pilot, *see supra* Part II.A, the Commission's reasoning as to conflicts of interest is flawed in several other respects.

*First*, the Commission failed to provide a reasoned, evidence-based explanation for adopting its new position that exchange rebates generate conflicts of interest. *See Am. Wild Horse Preservation Campaign*, 873 F.3d at 923. According

43

to the Commission, broker-dealers could decide to route orders to exchanges that offer better rebates even if those exchanges are not ideal for the customer. JA_[89.Fed.Reg.at.81,742].  But the Access-Fee Rule does not identify any real-world examples of broker-dealers actually routing orders to exchanges that offer higher rebates but suboptimal execution quality for the customer.  The Commission instead relied on generalized, evidence-free speculation about what *could* potentially happen—underscoring that evidence about the existence of an actual conflict of interest is no stronger today than it was when the Commission adopted the Fee Pilot Rule to study this very issue in 2018.  *See*, *e.g.*, JA_[89.Fed.Reg.at.81,761] ("This conflict, *if acted on*, can lead to inefficient order routing and worse transaction outcomes for customers") (emphasis added);  JA_[89.Fed.Reg.at.81,682.n.986] (same).

The threadbare statements in comment letters quoted by the Commission do not adequately support its position, either.  For instance, RBC declared—without any evidence—that "'we believe that lowering the access fee cap would lead to a reduction in broker conflicts of interest.'"  JA_[89.Fed.Reg.at.81,760.n.1744] (quoting JA_[RBC.Letter,at.4(Mar.31,2023)]).  Similarly, the Retirement Coalition asserted—again without any concrete evidence—that "'the use of rebates creates conflicts of interest.'"  JA_[89.Fed.Reg.at.81,741.n.1514] (quoting JA_[Retirement.Coalition.Letter,at.2(Mar.31,2023)]).

44

The Commission's reliance on these conclusory comment letters—without conducting its own independent analysis to assess whether the current level of access fees has actually led any broker-dealer to act on a conflict of interest—is legally insufficient.  *See Susquehanna*, 866 F.3d at 447 (faulting the Commission for its "unquestioning reliance" on a self-regulatory organization's "defense of its own actions" and explaining that the Commission needed to "have critically reviewed [the] analysis or performed its own").  Indeed, the Commission did not identify any evidence—generated by a commenter or by the Commission—demonstrating either that (i) the current level of access fees and rebates has caused any broker-dealer to act upon a conflict in routing orders or (ii) lowering the access-fee cap would ameliorate the issue.  If conflicts of interest are as pervasive as the Commission suggests, it should have been able to identify real-world examples.

*Second*, the Access-Fee Rule is internally inconsistent in its treatment of conflicts of interest.  In some passages, the Commission was adamant that "the lower access fee cap is . . . expected to reduce broker-dealer conflicts of interest." JA_[89.Fed.Reg.at.81,756].  Yet, at other times, the Commission retreated to the uncertainty it expressed in the Fee Pilot Rule, referring repeatedly to "*potential* conflicts of interest."  JA_ [89.Fed.Reg.at.81,647] (emphasis added); *see also* JA_[89.Fed.Reg.at.81,741] ("The Commission agrees that lowering the access fee cap reduces complexity and may help alleviate potential conflicts of interest.").

45

Similarly, the Commission was inconsistent about whether this "potential" conflict of interest actually makes a difference in the market.  On the one hand, the Commission asserted that there are "significant reasons to believe that rebates present a conflict of interest."  JA_[89.Fed.Reg.at.81,742].  Yet, in the very same sentence, the Commission conceded that there is "uncertainty regarding to what degree those potential conflicts of interest are being *acted upon*."  *Id.* (emphasis added).  And it acknowledged that a higher access-fee cap would increase a broker-dealer's profits only "*if* [a broker-dealer] acted on the conflict of interest." JA_[89.Fed.Reg.81,768].

If the Commission cannot even say with confidence that the purported conflicts of interest are having a tangible effect on market dynamics—or that reducing the access-fee cap would help address those effects—then it cannot justify taking extreme regulatory measures to mitigate them.  Indeed, that was precisely the flaw this Court identified in the Fee Pilot.  *See NYSE*, 962 F.3d at 556 ("an agency regulation must be designed to address identified problems").

*Third*, the Commission failed to consider that its other regulatory initiatives may be sufficient to mitigate any conflict of interest that actually exists.  *See*, *e.g.*, *Yakima Valley Cablevision v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986) (an agency's failure to consider an "obvious and less drastic alternative" was arbitrary and capricious).  For example, the Commission has proposed to strengthen broker-

46

dealers' existing best-execution obligations—which require routing orders to the platform offering the most favorable execution for the customer—in its proposed Regulation Best Execution. *See Regulation Best Execution*, Release No. 34-96496, 88 Fed. Reg. 5440 (Jan. 27, 2023). The Commission specifically touted potential "reductions in conflicts of interest when handling retail customer orders" as a principal justification for the best-execution proposal. *Id.* at 5523.

Similarly, the Access-Fee Rule itself includes an amendment to Rule 610(d) requiring that all fees and rebates be determinable "at the time of execution." JA_[89.Fed.Reg.at.81,663-66]. Commenters explained that this amendment would be sufficient to mitigate any potential conflicts of interest by enabling broker-dealers to pass rebates and fees on to their customers, which is much more difficult to do when fees and rebates are not determined until days or weeks after the fact. *See*, *e.g.*, JA_[Nasdaq.Letter.I,at.28-29(Mar.30,2023)]. And the Commission agreed, acknowledging that the amendment to Rule 610(d) would help to alleviate potential conflicts of interest. *See* JA_[89.Fed.Reg.at.81,703] ("making fees and rebates determinable at the time of trade may enhance broker-dealer order routing by helping mitigate a potential conflict of interest").

Nevertheless, in adopting the new 10-mils fee cap, the Commission failed to consider whether these two other reforms—one of which it was adopting simultaneously with the new fee cap—could ameliorate its concerns about potential

conflicts of interest without the need to impose a substantial fee-cap reduction. That was arbitrary and capricious. *See*, *e.g.*, *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 823-24 (D.C. Cir. 1983) (failure to consider a "very real possibility" was arbitrary and capricious). At the very least, the Commission was required to consider and assess the combined effect of those reforms as a reasonable alternative to the new fee cap. *See*, *e.g.*, *Am. Radio Relay League v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) ("An agency is required 'to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'") (citation omitted).

It is no answer that the Commission has not yet finalized its best-execution measure. The amendments to Rule 610(d) have been finalized, and, in any event, before proceeding with a potentially market-destabilizing reduction in the access-fee cap, the Commission could have moved forward with best-execution reform and studied the effects of that amendment—along with the newly adopted requirement that fees and rebates be determinable at the time of execution—to determine whether any further regulatory changes were warranted. Its failure to do so requires vacatur. *See Yakima Valley*, 794 F.3d at 746.

### C. The New Access-Fee Cap Of 10 Mils Is Not Supported By Record Evidence.

Even if the Commission (i) had statutory authority to impose an across-the-board access-fee cap and (ii) provided a reasoned explanation that *some* fee-cap

48

reduction is warranted, the Commission was still required to provide a reasoned, evidence-based explanation for deciding to impose a 10-mils cap for securities priced at or above $1.00 (or 0.1% of the quotation price for securities priced under $1.00)—a two-thirds reduction in the 30-mils cap that has been on the books since 2005. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48-49 ("an agency must cogently explain why it has exercised its discretion in a given manner"). The Commission failed to do so.

### 1. The Commission Erroneously Analogized Exchanges To Alternative Trading Systems.

The Commission's decision to set the new access-fee cap at 10 mils relies almost exclusively on achieving parity with the fees purportedly charged by alternative trading systems. *E.g.*, JA_[89.Fed.Reg.at.81,735] ("a uniform access fee cap of 10 mils would have the added benefit of aligning exchange fees with prevailing ATS fees, and creating a more equitable . . . landscape across trading venues"). The Commission's reliance on alternative trading systems' fees is arbitrary and capricious for several reasons.

*First*, the Commission's conclusion runs counter to substantial record evidence demonstrating critical differences between alternative trading systems and securities exchanges that make alternative trading systems an inapt comparator. For example, exchange pricing is designed to attract quotations to their platforms, whereas pricing on alternative trading systems is designed only for trades.

49

JA_[Nasdaq.Letter.IV,at.7(Mar.25,2024)].   Additionally, exchange fees are meant to compensate for the risk associated with posting quotations on a "lit" market—in contrast with alternative trading systems' "dark" platforms that do not disseminate quotation information—and the value associated with accessing immediate liquidity. *Id.* And off-exchange venues operate with fewer regulatory constraints than exchanges.   JA_[Cboe.Letter.III,at.8-10(Aug.23,2023)].   For all of these reasons, exchange fees should generally be higher than alternative trading systems' fees. JA_[Nasdaq.Letter.IV,at.7(Mar.25,2024);Cboe.LetterIII,at.8-10(Aug.23,2023)].

The Commission largely ignored the multiple reasons that alternative trading systems are an unreliable benchmark for exchange fees—identifying those considerations, but failing to grapple with them in any meaningful way.   *See* JA_[89.Fed.Reg.at.81,661] (referring to commenter that "stated [] ATS fees are not a good benchmark").  Instead, the Commission offered a *non sequitur*.  It responded that, when adopting the original 30-mils access-fee cap in 2005, it considered the fees charged by other trading centers such as electronic communication networks. JA_[89.Fed.Reg.at.81,661-62].   But whether electronic communication networks were relevant to the Commission's fee-setting inquiry nearly twenty years ago says nothing about whether alternative trading systems are a proper benchmark for a drastically reduced access-fee cap today.  *See*, *e.g.*, *Dow AgroSciences LLC v. Nat'l*

*Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (use of "outdated data" was arbitrary and capricious).

*Second*, to support its comparison with alternative trading systems' fees, the Commission relied heavily on two commenters that have been outspoken critics of the prevailing fee-and-rebate model, JA_[89.Fed.Reg.at.81,661.n.658] (citing Professor Verret and IEX); JA_[89.Fed.Reg.at.81,735.n.1442], without discharging its obligation to undertake an independent assessment of their supposed evidence. *See Susquehanna*, 866 F.3d at 447. Professor Verret did not even provide a citation for his assertion that alternative trading systems "have been able to provide access to their platforms at 10 mils." JA_[Verret.Letter.III,at.3(Jan.12,2024)]. And, the Commission ignored that IEX misstated one of its key sources. IEX cited research from Phil Mackintosh, Nasdaq's Chief Economist, which supposedly supported IEX's position that alternative trading systems are a proper comparator for securities exchanges. JA_[IEX.Letter.VI,at.5(Apr.19,2024)]. But Mr. Mackintosh submitted a letter directly refuting IEX's statements and correcting the record about his empirical work. JA_[Nasdaq.Letter.V,at.1-2(May.7,2024)]. His research provides no support for IEX's position that an access-fee cap of 10 mils aligns with pricing on alternative trading systems. To the contrary, Mr. Mackintosh's research found that "little is known about the 'typical' charge on an alternative trading system" and that the evidence is inconclusive as to whether 10 mils is the typical fee.

JA_[Nasdaq.Letter.V,at.2.(May.7,2024)]; *see also* JA_[Nasdaq.Letter.IV,at.7-8.(Mar.25,2024)] ("ATS fees are highly variable (to the extent they are known publicly)") (emphasis omitted).

That is consistent with the Commission's own recognition that "the fees [alternative trading systems] charge generally do not have a standard structure and are often negotiated between the [alternative trading system] and the customer." JA_[89.Fed.Reg.81,698]; *see also* 84 Fed. Reg. at 5292 (acknowledging in the Fee Pilot Rule that off-exchange venues charge "idiosyncratic and individually-negotiated fees to market participants").

The question of fees charged by alternative trading systems did not need to be a hypothetical exercise. The Commission could have obtained information directly from alternative trading systems about their transaction fees. Indeed, while alternative trading systems are not subject to the same degree of regulatory oversight as exchanges, they are nevertheless subject to Commission reporting requirements, including a quarterly update—known as an ATS-R report—that describes the volume and dollar amount of trades on the platform. 17 C.F.R. § 242.301(b)(9). Additionally, the Commission's Division of Examinations could have used its inspection authority over brokers to learn about alternative trading systems' fees. 15 U.S.C. § 78q(b). In short, the Commission had multiple tools for ascertaining with certainty the fees actually charged by alternative trading systems, but instead elected

to rely on anecdotal evidence and unsubstantiated representations by self-interested commenters.

Finally, the Commission failed to grapple with the fact that alternative trading systems are just one type of off-exchange venue. *See* JA_[Cboe.Letter.III,at.3.(Aug.23,2023)]. The Commission did not attempt to demonstrate that alternative trading systems are representative of off-exchange venues by, for example, quantifying the percentage of off-exchange transactions that take place on alternative trading systems.

The Commission's decision to adopt the 10-mils cap based on an analogy to alternative trading systems was unreasoned and unsubstantiated, and thus arbitrary and capricious. *See Genuine Parts Co.*, 890 F.3d at 312.

### 2. The Commission's Other Reasons For Setting The Fee Cap At 10 Mils Are Not Supported By Record Evidence.

The Commission's additional reasons for selecting 10 mils as the new access-fee cap are not supported by the record. Given the Commission's acknowledged uncertainty in the Fee Pilot about how the market would react to any changes to the exchanges' fee-and-rebate model, it was incumbent on the Commission to support its selection of 10 mils with evidence that postdates the Fee Pilot. Instead, it relied on multiple assumptions that it failed to substantiate with record evidence.

*First*, the Commission stated that imposing an access-fee cap of 10 mils is essential to "restore[] price coherence," which can be lost "when the spread is less

53

than twice the fee." JA_[89.Fed.Reg.at.81,682]; *see also* JA_[89.Fed.Reg.at.81,732] ("Lowering the access fee cap preserves price coherence."). But the Commission failed to analyze how a different access-fee cap—one short of the dramatic reduction to 10 mils—would affect coherence. As the Commission conceded, price coherence can be maintained as long as the access fee is no more than one-half of the minimum pricing increment. JA_[89.Fed.Reg.at.81,651].

The Commission did not consider the possibility that other fee-cap levels could meet the Commission's price-coherence criteria and, instead, proceeded as though 30 mils and 10 mils were the only options in a binary landscape. Despite acknowledging that there was a "divergence of opinion around the appropriate level of the access fee cap," JA_[89.Fed.Reg.at.81,658], the Commission did not meaningfully explore potential reductions less steep than the two-thirds drop it mandated. For example, multiple commenters cited by the Commission advocated other fee-cap levels. *See*, *e.g.*, JA_[Fidelity.Letter,at.14-15(Mar.31,2023)] ("the access fee should be halved, or reduced from the current fee of 30 mil under 1 cent, to 15 mil under a 50-mil tick"). Indeed, the initial Fee Pilot proposal suggested that multiple tiers are necessary to test how the market will react to reductions in the fee cap. 83 Fed. Reg. at 13,029.

*Second*, the Commission asserted that the "amendments to Rule 610(c) will continue to allow the exchanges to provide execution services using their current business models, innovate and compete for order flow." *E.g.*, JA_[89.Fed.Reg.at.81,658]. But the Commission provided essentially *zero* evidence for its statements about innovation. It cited to a handful of scattered pages from comment letters, but none of those citations speaks to exchanges' ability to innovate. *See* JA_[89.Fed.Reg.at.81,659.n.599] (citing JA_[Proof.Letter,at.1(Mar.31,2023)]; JA_[Retirement.Coalition.Letter,at.1-2.(Mar.31,2023)]). For example, the Retirement Coalition contended that the existing cap "does not reflect the enormous efficiency gains from technology advances," JA_[Retirement.Coalition.Letter,at.1-2.(Mar.31,2023)], but it did not explain how the fees generated under a reduced cap will be sufficient to generate continued innovation. Similarly, Proof Services wrote that it would like to see a fee cap that is "at a level that is much lower than it is today but high enough to support a competitive variety of exchange business models." JA_[Proof.Letter,at.1.(Mar.31,2023)]. But Proof Services never specified that *10* mils would, in fact, be the appropriate "level" to support innovation in exchange business models.

Moreover, the Commission's reasoning is itself internally inconsistent about how the new fee cap will affect exchanges' innovation and investment in technology. At times, the Commission declared definitively that the amendments will "allow the

55

exchanges to provide execution services using their current business models, innovate and compete for order flow." JA_[89.Fed.Reg.at.81,658]. Yet it later "acknowledge[d] a loss in revenue" for exchanges "due to the reduction in rebates for stocks priced below $1.00," which "could impact exchange investment in new technologies." JA_[89.Fed.Reg.81,740]; *see also* JA_[89.Fed.Reg.at.81,732] ("Lowering the access fee cap will reduce exchange transaction revenue due to lower capture on sub-$1.00 stocks."). This "internally inconsistent" reasoning is a hallmark of arbitrary-and-capricious decision-making. *See*, *e.g.*, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018) (invalidating agency action because agency's analysis was internally inconsistent).[4]

*Third*, the Commission failed to provide adequate support for its view that a 10-mils fee cap will enable exchanges to maintain the same "net capture rates"— i.e., the difference between the access fee they receive and the rebate they pay out— despite the significantly reduced fee cap. *See* JA_[89.Fed.Reg.at.81,658] ("trading centers will continue to be able to assess fees for transaction services at a level that

---

[4] After "acknowledg[ing] a loss in revenue" that "could impact" innovation, the Commission went on to state that "the amendments to *Rule 612*"—i.e., the new sub-penny minimum pricing increment—"are anticipated to lead to more volume on exchange, offsetting this effect." JA_[89.Fed.Reg.81,740] (emphasis added). But that prediction about the impact of Rule 612 cannot reconcile the Commission's statement here with its statement elsewhere that "[t]he amendments to *Rule 610(c)* will continue to allow exchanges to . . . innovate." JA_[89.Fed.Reg.at.81,658] (emphasis added).

will result in the same net capture as they earn today if they so choose" ).  The Commission estimated that "most exchanges" retain a net capture of 2 mils, while simultaneously conceding that "[c]omplex fee schedules and volume-based tiers mean that it is difficult for the Commission to determine the net capture on a given exchange"—a concession that undermines the entirety of the Commission's net-capture analysis.  JA_[89.Fed.Reg.at.81,660,81,696].  But even if the Commission's estimate is correct, the Commission did not adequately explain why exchanges will be able to maintain a net capture rate of 2 mils under the amended fee cap.

In particular, the Commission acknowledged "uncertainty over whether [the] 2 mils capture rate will persist or be different should trading venues choose to alter their business model in response to the change in access fees." JA_[89.Fed.Reg.at.81,733].  And the record is replete with evidence that exchanges *will* need to change their business models to account for the Rule's two-thirds reduction in their access fees (and corresponding reduction in their ability to pay rebates).        JA_[CBOE.Letter.III.at.7-8(Aug.23,2023);Nasdaq.Letter.I.at.22-26.(Mar.30,2023)].

Similarly, the Commission assumed that the vast majority of the revenue that exchanges generate from access fees is used to fund rebates as opposed to execution services.  JA_[89.Fed.Reg.at.81,735].  But that assumption was based principally on the conclusory assertions of a handful of commenters that exchanges charge

57

excessive fees.  *E.g.*, *id.* (citing JA_[Citigroup.Letter,at.5(Mar.31,2023)]); *see also*

JA_[89.Fed.Reg.at.81,660&n.629]     (quoting     JA_[Better.Markets.Letter,at.16.

(Mar.31,2023)]).  For instance, Citigroup cited no evidence for the proposition that

"spreads have narrowed and commissions have decreased considerably," instead

relying on stale comment letters that it submitted a decade ago.  *See*

JA_[Citigroup.Letter,at.5.(Mar.31,2023)] (citing Citigroup letters from 2013 and

2014).  And for its part, Better Markets contended—without even a citation—that

"[t]here is certainly no economic justification in terms of defraying the exchanges'

costs of processing and matching trades, as those costs have dropped with the advent

of advances in technology."  JA_[Better.Markets.Letter,at.16.(Mar.31,2023)].

        Neither the Commission nor the comment letters on which it relied undertook

any empirical analysis to determine whether—and to what extent—exchanges'

access fees are actually "excessive."  Nor did they point to concrete evidence

establishing what percentage of access-fee revenue exchanges allocate to funding

execution services.  Indeed, the record shows that exchanges' execution-related costs

have not decreased over time because exchanges are faced with escalating

regulatory-compliance expenses.  *See*  JA_[Cboe.Letter.III,at.5.(Aug.23,2023)].

And, in any event, as the record also illustrates, access fees compensate exchanges

for    more    than    the    mere    costs    of    effecting    a    trade.

JA_[Nasdaq.Letter.I.at.21.(Mar.30,2023);Nasdaq.Letter.II.at.4.(Aug.9,2023)].

They also reflect the risk associated with posting quotations on a "lit" market and the value derived from having immediate access to liquidity. JA_[Nasdaq.Letter.IV,at.7.(Mar.25,2024)].

In sum, none of the Commission's explanations for setting the new fee cap at 10 mils withstands arbitrary-and-capricious review.

### D.   The Court Should Vacate The New Access-Fee Cap And The Inextricably Intertwined Amendment To The Minimum Pricing Increment.

Because the Commission exceeded its statutory authority and engaged in arbitrary and capricious decision-making when it adopted the new access-fee cap, this Court should invalidate the amendment to Rule 610(c) adopting the new 10-mils fee cap.  *See* 5 U.S.C. § 706(2); *see also Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023) ("vacatur is the normal remedy" in cases of unlawful agency action) (internal quotation marks omitted).

The Court should likewise vacate the amendment to Rule 612 adopting the new sub-penny minimum pricing increment because, as the Commission itself acknowledged, that amendment is not severable from the amendment to Rule 610(c). As the Commission explained, its position is that a sub-penny pricing increment cannot be implemented without a modification to the existing 30-mils fee cap.  *See* JA_[89.Fed.Reg.at.81,682] ("Absent a reduction in the maximum access fee, a round-trip buy and sell for stocks quoted at the new half-penny tick would require

paying more in fees (0.60 cents) than in the spread itself (0.50 cents)").    The Commission therefore adopted the 10-mils access-fee cap "[t]o accommodate the amendments to Rule 612." JA_[89.Fed.Reg.at.81,648].  Because the amendment to Rule 612 cannot stand alone, the amendments to Rule 610(c) and Rule 612 must fall together.

## CONCLUSION

The Court should vacate the Access-Fee Rule's amendments to Rule 610(c) and Rule 612.

Dated:  December 20, 2024

Respectfully submitted,


Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr. Suite 7100
Chicago, IL  60606
(312) 258-5702
paul.greenwalt@afslaw.com
michael.molzberger@afslaw.com

*Counsel for Petitioners*
*Cboe Global Markets, Inc.,*
*Cboe BZX Exchange, Inc.,*
*Cboe BYX Exchange, Inc.,*
*Cboe EDGA Exchange, Inc.,*
*Cboe EDGX Exchange, Inc.*

*/s/ Amir C. Tayrani*
Amir C. Tayrani
Alex Gesch
Cameron J.E. Pritchett
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 887-3692
atayrani@gibsondunn.com
agesch@gibsondunn.com
cpritchett@gibsondunn.com

Jeffrey S. Davis
Brett M. Kitt
Joanne Pedone
John Yetter
NASDAQ, INC.
805 King Farm Boulevard
Rockville, MD  20850

*Counsel for Petitioners*
*Nasdaq, Inc., The Nasdaq Stock Market*
*LLC, Nasdaq BX, Inc., and Nasdaq*
*PHLX LLC*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because the brief contains 12,950 words, as determined by the word-count function of Microsoft Word 2019, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.    This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated:  December 20, 2024

Respectfully submitted,

*/s/ Amir C. Tayrani*
Amir C. Tayrani
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 887-3692
atayrani@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated:  December 20, 2024                Respectfully submitted,

                                        /s/ Amir C. Tayrani
                                        Amir C. Tayrani
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1700 M Street, N.W.
                                        Washington, D.C.  20036
                                        (202) 887-3692
                                        atayrani@gibsondunn.com