[INITIAL BRIEF]

[ORAL ARGUMENT NOT YET SCHEDULED]

No. 24-1350

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

Cboe Global Markets, Inc., *et al.*,

Petitioners,

v.

Securities and Exchange Commission,

Respondent.

———————————————

On Petition for Review of a Rule
of the Securities and Exchange Commission

———————————————

**BRIEF OF RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

———————————————

JEFFREY B. FINNELL
*Acting General Counsel*

TRACEY A. HARDIN
*Solicitor*

DOMINICK V. FREDA
*Assistant General Counsel*

DANIEL E. MATRO
*Senior Appellate Counsel*

BROOKE J. WAGNER
*Appellate Counsel*

SECURITIES AND EXCHANGE
  COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292 (Wagner)
wagnerbr@sec.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties

All parties appearing in this Court are listed in petitioners' opening brief.

## B.    Ruling under Review

Petitioners seek review of *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, Release No. 34-101070, 89 Fed. Reg. 81620 (Oct. 8, 2024).

## C.    Related Cases

This case was previously consolidated with case nos. 24-1302, 24-1303, 24-1317, and 24-1319, but those cases were voluntarily dismissed and the consolidation terminated.  *See* Doc. No. 2089532.  The Commission is not aware of any other related cases.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .........ii

TABLE OF AUTHORITIES ........................................................................ v

GLOSSARY ............................................................................................. IX

INTRODUCTION ...................................................................................... 1

ISSUES PRESENTED ............................................................................... 3

STATUTES AND REGULATIONS ........................................................... 3

STATEMENT OF THE CASE .................................................................... 4

    A.    Statutory and Regulatory Background ...................................... 4

        1.    Section 11A ...................................................................... 4

        2.    Regulation NMS ............................................................... 6

        3.    Subsequent Developments................................................. 8

    B.    The Rules ...................................................................................11

        1.    The Proposed Rules..........................................................11

        2.    The Final Rules ................................................................ 13

    C.    Procedural History ................................................................... 19

STANDARD OF REVIEW ...................................................................... 19

SUMMARY OF ARGUMENT ..................................................................20

ARGUMENT............................................................................................ 21

I.    The Access-Fee-Cap Amendment falls squarely within the Commission's statutory authority to oversee the national market system....................................................................................... 21

A.    Multiple Exchange Act provisions authorize access-fee caps. .......................................................... 22

B.    Petitioners' contrary arguments are meritless. ........................ 25

II.    The Access-Fee-Cap Amendment is reasonable and reasonably explained. .......................................................... 30

A.    The TFP is a red herring. ............................................................ 30

B.    The Commission reasonably explained why the Access-Fee-Cap Amendment will benefit investors. ............................. 36

1.    Transaction Costs ............................................................ 37

2.    Order Flow ....................................................................... 40

3.    Conflicts of Interest ........................................................ 42

4.    Other Benefits ................................................................. 44

C.    The Commission drew a reasonable line in the Access-Fee-Cap Amendment. ................................................................ 45

1.    The Commission reasonably balanced competing factors in revising the access-fee cap. ............................. 45

2.    Petitioners' focus on ATS fees is misguided. ................... 48

3.    Petitioners' speculative concerns about their bottom lines provide no basis for overturning the Commission's reasoned decision-making. ....................... 51

CONCLUSION .......................................................................................... 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*AD HOC Telecomms. Users Comm. v. FCC,*
572 F.3d 903 (D.C. Cir. 2009) ............................................ 36

*Am. Great Lakes Ports Ass'n v. Schultz,*
962 F.3d 510 (D.C. Cir. 2020) ............................................ 50

*Am. Hosp. Ass'n v. Azar,*
983 F.3d 528 (D.C. Cir. 2020) ............................................ 37

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n,*
567 F.2d 1016 (D.C. Cir. 1977) ........................................... 39

*Am. Wild Horse Pres. Campaign v. Perdue,*
873 F.3d 914 (D.C. Cir. 2017) ............................................ 33

*AT&T Corp. v. FCC,*
220 F.3d 607 (D.C. Cir. 2000) ........................................ 19, 48

*Bartenwerfer v. Buckley,*
598 U.S. 69 (2023) ....................................................... 27

*Bloomberg L.P. v. SEC,*
45 F.4th 462 (D.C. Cir. 2022) ............................................ 55

*Bradford Nat'l Clearing Corp. v. SEC,*
590 F.2d 1085 (D.C. Cir. 1978) ........................................... 4

*Chamber of Com. v. SEC,*
412 F.3d 133 (D.C. Cir. 2005) ............................................ 35

*Children's Hosp. Ass'n of Tex. v. Azar,*
933 F.3d 764 (D.C. Cir. 2019) ............................................ 28

*Citadel FNGE Ltd. v. FERC,*
77 F.4th 842 (D.C. Cir. 2023) ............................................ 39

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.,*
536 U.S. 424 (2002) ...................................................... 28

*Covad Comm'ns Co. v. FCC,*
450 F.3d 528 (D.C. Cir. 2006) ........................................ 45, 48

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................ 32, 33, 51

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................ 36

*Field v. Mans*,
    516 U.S. 59 (1995) ................................................................ 28, 29

*Fresno Mobile Radio, Inc. v. FCC*,
    165 F.3d 965 (D.C. Cir. 1999) ................................................ 46

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) .......................................................... 24

*Martin v. Hadix*,
    527 U.S. 343 (1999) ............................................................... 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................ 19

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) .............................................. 5, 39

*Nasdaq Stock Mkt. LLC v. SEC*,
    34 F.4th 1105 (D.C. Cir. 2022) .............................................. 48, 54, 55

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) .................................................... 36

*Nat'l Postal Policy Council v. Postal Regulatory Comm'n*,
    17 F.4th 1184 (D.C. Cir. 2021) .............................................. 28

*NYSE v. SEC*,
    962 F.3d 541 (D.C. Cir. 2020) ............................ 10, 24, 30, 31, 33, 34, 35

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) .................................................. 39

*WorldCom, Inc. v. FCC*,
    238 F.3d 449 (D.C. Cir. 2001) ............................................... 45

## Statutes

5 U.S.C. 706(2) ........................................................................... 19

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
    Section 6(e)(2), 15 U.S.C. 78f(e)(2) ..................................................... 28
    Section 6(b)(4), 15 U.S.C. 78f(b)(4) ............................................... 26, 29
    Section 11A, 15 U.S.C. 78k-1 ...........................................4, 5, 6, 24, 25, 29
    Section 11A(a)(1), 15 U.S.C. 78k-1(a)(1)(C) ................................. 5, 22, 29
    Section 11A(a)(2), 15 U.S.C. 78k-1(a)(2) ........................................... 4, 22
    Section 11A(c)(1), 15 U.S.C. 78k-1(c)(1) ..................................... 25, 29
    Section 11A(c)(1), 15 U.S.C. 78k-1(c)(1)(B) ......................... 8, 20, 22, 23
    Section 11A(c)(1), 15 U.S.C. 78k-1(c)(1)(E) ..................................... 20, 22
    Section 11A(c)(1), 15 U.S.C. 78k-1(c)(1)(F) ..................................... 22, 29
    Section 19, 15 U.S.C. 78s ..................................................... 25, 26, 27, 29
    Section 19(b), 15 U.S.C. 78s(b) ........................................................... 26
    Section 19(b)(3), 15 U.S.C. 78s(b)(3)(C) ............................................. 26
    Section 19(c)(4), 15 U.S.C. 78s(c)(4) ............................................. 27, 29
    Section 23(a)(1), 15 U.S.C. 78w(a)(1) ............................ 10, 20, 22, 23, 25
    Section 31(a), 15 U.S.C. 78ee(a) ......................................................... 28

## Rules under the Securities Exchange Act of 1934, 17 C.F.R. § 242.600, et seq.

Rule 600, 17 C.F.R. 242.600(b)(106) .................................................. 9, 26
Rule 610, 17 C.F.R. 242.610......................................................7, 11, 12, 14, 19
Rule 610(c), 17 C.F.R. 242.610(c) .................................................. 21, 25, 26
Rule 610(d), 17 C.F.R. 242.610(d) .......................................................... 44
Rule 611, 17 C.F.R. 242.611......................................................................... 6, 7
Rule 612, 17 C.F.R. 242.612 ......................................................6, 11, 13, 47

## Commission Materials

Regulation NMS,
70 Fed. Reg. 37496 (June 29, 2005) ............ 6, 7, 8, 9, 21, 23, 24, 25, 42, 49

Concept Release on Equity Market Structure,
75 Fed. Reg. 3594 (Jan. 21, 2010) ............................................................. 5

Crowdfunding,
80 Fed. Reg. 71388 (Nov. 16, 2015) ........................................................ 35

Securities Transaction Settlement Cycle,
82 Fed. Reg. 15564 (Mar. 29, 2017) ........................................................... 35

Transaction Fee Pilot for NMS Stocks,
84 Fed. Reg. 5202 (Feb. 20, 2019) ........................................... 10, 31, 34, 35

Regulation NMS: Minimum Pricing Increments, Access Fees, and
Transparency of Better Priced Orders,
87 Fed. Reg. 80266 (Dec. 29, 2022) ................................................ 11, 12, 13

Regulation NMS: Minimum Pricing Increments, Access Fees, and
Transparency of Better Priced Orders,
89 Fed. Reg. 81620 (Oct. 8, 2024) ....... 1, 6, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19,
21, 23, 24, 25, 26, 31, 32, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47,
48, 49, 50, 51, 52, 53, 54, 55

Nasdaq, Inc., Exchange Act Release No. 34-101899,
2024 WL 5094955 (Dec. 12, 2024)............................................................19

## Legislative Materials

Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97 .........4

S. Rep. No. 94-75 (1975) ............................................................ 4, 5, 27, 29

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| ATS | Alternative Trading System |
| Commission or SEC | Securities and Exchange Commission |
| Exchange Act or Act | Securities Exchange Act of 1934 |
| NMS | National Market System |
| Rules | *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, Exchange Act Release No. 34-101070, 89 Fed. Reg. 81620 (Oct. 8, 2024). |
| TFP | Transaction Fee Pilot |

## INTRODUCTION

Petitioners (two groups of national securities exchanges) challenge rules unanimously adopted by the Securities and Exchange Commission ("SEC" or "Commission") in response to industry-wide calls to update the minimum pricing increment (or "tick") for certain stock quotations. *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, Exchange Act Release No. 34-101070, 89 Fed. Reg. 81620 (Oct. 8, 2024) (the "Rules"). Because the Rules represent a reasonable exercise of the authority Congress granted to the Commission to facilitate the development and operation of a national market system and the Commission's actions were both reasonable and reasonably explained, that challenge should be rejected.

Market participants widely encouraged the Commission to lower the tick size to lower costs for investors and improve competition and price efficiency in the markets (the "Tick-Size Amendment"). Market participants also widely agreed that, if the tick size were lowered, a concomitant reduction in the maximum fees trading centers charge to access certain of those quotations (the "Access-Fee-Cap Amendment") would be necessary. As the Commission explained (and commenters agreed), the preexisting cap would permit access fees (up to $0.003, or 30 "mils") greater than half the new tick size ($0.005), distorting the market and undermining price coherence. Market participants thus widely

accepted that the desired reduction in the tick size could not be achieved without also revising the access-fee cap.

In determining the amount of this necessary reduction in the fee cap, the Commission weighed numerous competing concerns, taking into account data, theory, scholarship, and thousands of comments in order to balance trading centers' ability to operate, innovate, and compete while also addressing market distortions, improving price transparency, and lowering costs for investors. The Commission then reasonably drew the line at $0.001 (or 10 mils) per share for protected quotations priced at/above $1 (and 0.1% of the quotation price per share for protected quotations under $1), concluding that such an access-fee cap would appropriately accommodate and balance these interests and benefit investors.

Petitioners supported reducing the tick size and recognized that doing so would require reducing access fees. They disagree, however, with the amount of the fee-cap reduction the Commission ultimately adopted. Petitioners would have preferred the Commission draw a different line that better served their own financial interests, but they identify no valid basis to overturn the reasonable balance struck by the Commission between those interests and the market-wide benefits of lower costs, increased transparency, and decreased market distortions.

Petitioners' argument that the Access-Fee-Cap Amendment exceeds the Commission's authority finds no support in the text, structure, or history of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), and would unravel the regulatory framework that has governed the national

market system for decades.  Their arguments that the Access-Fee-Cap Amendment is arbitrary and capricious alternately mischaracterize that amendment as a standalone ratemaking decision, a do-over of prior Commission action on exchange fee-and-rebate structures, or a reflexive conforming of exchange fees to those of off-exchange venues.  Only in the final pages of their brief do petitioners acknowledge the critical link between the Access-Fee-Cap Amendment and the Tick-Size Amendment, essential context that fatally undercuts the argument preceding it.  Because the Commission acted reasonably and within its authority, the Court should affirm the Rules.

## ISSUES PRESENTED

1.  Whether the Commission's adoption of the Access-Fee-Cap Amendment falls within its authority under the Exchange Act to implement its statutory mandate to ensure that securities orders are transmitted and directed in a manner that promotes the fairness and efficiency of the national market system and to ensure the fairness and usefulness of quotation information.

2.  Whether the Commission's adoption of the Access-Fee-Cap Amendment was reasonable and reasonably explained.

## STATUTES AND REGULATIONS

Except for 15 U.S.C. 78w, 17 C.F.R. 242.611, and 17 C.F.R. 612, all pertinent statutes and regulations are included in petitioners' Addendum.

## STATEMENT OF THE CASE

### A.   Statutory and Regulatory Background

#### 1. Section 11A

In 1975, Congress added Section 11A to the Exchange Act, *see* Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97, to enable the Commission "to effect major changes in the method of handling securities transactions." *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1091 (D.C. Cir. 1978).  Section 11A was born out of Congress's reexamination of the securities markets prompted by certain "operational breakdowns and economic distortions."  *Id.* (cleaned up); *see also* S. Rep. No. 94-75, at 1 (1975).  In that reexamination, Congress found that "stock exchanges" and "established securities firms" "resisted industry modernization" and were "unable or unwilling to respond promptly and effectively to radically altered economic and technological conditions."  S. Rep. No. 94-75, at 1.

Congress accordingly "expanded" the Commission's authority, *Bradford*, 590 F.2d at 1091, and ordered the Commission "to facilitate the establishment of a national market system" ("NMS") for the trading of securities, in accordance with certain congressional findings and objectives, 15 U.S.C. 78k-1(a)(2).  In particular, Congress found it "in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure," among other goals: (i) the "economically efficient execution of securities transactions;" (ii) fair competition among markets; (iii) price transparency; (iv) the practicability

of best execution of investors' orders; and (v) "an opportunity ... for investors' orders to be executed without the participation of a dealer." *Id.* 78k-1(a)(1)(C). And Congress granted the Commission "'broad, discretionary powers' to ensure 'maximum flexibility' in 'overseeing the development of [the NMS]' and 'implementing its specific components in accordance with these findings and ... objectives.'" *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1131 (D.C. Cir. 2022) (quoting S. Rep. No. 94-75, at 7) (cleaned up).

Section 11A's objectives "can, at times, be difficult to reconcile." *Concept Release on Equity Market Structure*, 75 Fed. Reg. 3594, 3597 (Jan. 21, 2010) (explaining*, inter alia*, that competition among trading centers "can lead to the fragmentation of order flow" and practices "detract[ing] from public price transparency," but consolidating order flow "in a single venue would create a monopoly and thereby lose the important benefits of competition"). The Commission thus retains the "complex[]" task of "facilitat[ing] an appropriately balanced market structure that promotes competition among markets, while minimizing the potentially adverse effects of fragmentation on efficiency, price transparency, best execution of investor orders, and order interaction." *Id.*; *see also* S. Rep. No. 94-75, at 12. To do so, the Commission "monitor[s] these issues" and periodically revises its NMS rules to recalibrate "an appropriate balance of these multiple objectives" and ensure that the regulatory framework effectively promotes fair and orderly markets, investor protection, and capital formation. 75 Fed. Reg. at 3597.

### 2. Regulation NMS

In 2005, pursuant to Section 11A, the Commission adopted a suite of initiatives known as "Regulation NMS" to "modernize and strengthen" the NMS following "sweeping changes" in market centers, trading, and technology.  70 Fed. Reg. 37496, 37497 (June 29, 2005).  Three aspects are relevant here.

*First*, the Commission adopted Rule 612, which instituted a "tick" (minimum pricing increment) for quotes and orders in NMS stocks.  *Id.* at 37503.  A tick stops market participants from "stepping ahead," or gaining priority over a displayed limit order—a public order specifying the price at which the investor is willing to buy or sell a security—by an economically insignificant amount.  *Id.*  Stepping ahead can discourage displayed limit orders, which the Commission has recognized "as a critically important element of efficient price discovery" that "help[s] to set prices at which market participants are willing to trade, reveal[s] the supply and demand for a security, and provid[es] liquidity to the market."  JA_ [89.Fed.Reg.at.81622&n.13] (cleaned up).  The Commission set the tick at one cent for quotes and orders priced at/above $1, while acknowledging that market changes could later require changes to the tick size.  70 Fed. Reg. at 37553.

*Second*, to foster a fair and efficient NMS, the Commission adopted Rule 611 (the "Order Protection Rule"), which established "intermarket protection against trade-throughs."  *Id.* at 37501.  A trade-through occurs when one trading center executes an order at a price worse than that

displayed by another trading center, to the investor's detriment. *Id.* To prevent this, the Order Protection Rule is designed to stop brokers from executing trades at prices worse than the best protected quotation that can be found at any trading center. That means that every order displaying the best price, at any trading center, must be taken before a broker can fill an order at a trading center offering an inferior price. *Id.* at 37545. This both promotes displayed liquidity and ensures investors receive the best readily available prices.

*Third*, the Commission adopted Rule 610, which, *inter alia*, capped the fees that a trading center could charge to access its protected quotations. *Id.* at 37502–03. The access-fee cap prevented a trading center from charging high fees to those who, by virtue of the Order Protection Rule, were compelled to access that center's quotes. The cap thus followed directly from, and was "necessary to support the integrity of[, Rule 611's] price protection requirement" because "some 'outlier' trading centers might take advantage of the requirement to protect displayed quotations by charging exorbitant fees to those required to access the outlier's quotations … which would compromise the fairness and efficiency of the NMS." *Id.* at 37503. The Commission likened this behavior to "acting essentially as a toll booth between price levels," charging exorbitant fees because "prices could not move to the next level until someone routed an order to take out the displayed price." *Id.* at 37545.

In addition, the Commission found capping access fees necessary to ensure the "fairness and usefulness of quotation information" by

"precluding the distortive effects of exorbitant fees." *Id.*; *see* 15 U.S.C. 78k-1(c)(1)(B). As it explained, "[f]or quotations to be fair and useful, there must be some limit on the extent to which the true price for those who access quotations can vary from the displayed price." 70 Fed. Reg. at 37545. "If outlier markets are allowed to charge high fees and pass most of them through as rebates, the published quotations of such markets would not reliably indicate the true price that is actually available to investors or that would be realized by liquidity providers." *Id.* The Commission also deemed the access-fee cap "necessary to further the statutory purpose of enabling broker-dealers to route orders in a manner consistent with the operation of the NMS"—*i.e.*, "to those markets displaying the best-priced quotations." *Id.*

Regulation NMS originally set the cap at $0.003 (30 mils) per share for protected quotations priced at/above $1 and at 0.3% of the share price for protected quotations priced below $1. *Id.* at 37545 & n.419. The Commission observed that this rate was consistent with trading centers' then-prevailing rates and concluded that it should not impair trading centers' existing business models. *Id.* at 37545. It then "left it to the markets and competition to determine what [fee] strategies would be successful in attracting order flow, subject to the maximum access fee cap." JA_ [89.Fed.Reg.at.81656]; 70 Fed. Reg. at 37584.

### 3. Subsequent Developments

Twenty years since the adoption of Regulation NMS, stocks are traded at a range of trading centers, which include dozens of national

securities exchanges, alternative trading systems ("ATSs"), and other off-exchange venues like wholesalers or broker-dealers that execute orders internally. *See, e.g.*, 17 C.F.R. 242.600(b)(106); JA_ [89.Fed.Reg.at.81752.n.1640].

Exchanges have developed extensive fee structures incorporating both fees charged and rebates paid to market participants. JA_ [89.Fed.Reg.at.81645]. These varying fee-and-rebate schedules are "complex," "constantly changing," and often use contemporaneous-month volume-based pricing, leaving it difficult for market participants to evaluate trading costs. JA_ [89.Fed.Reg.at.81693–94]. The predominant structure is "maker-taker," in which an exchange charges an access fee to liquidity takers (who submit orders to trade with a resting order), provides a rebate to liquidity providers (who post the resting orders with which liquidity takers trade), and earns the difference between the fee collected and rebate provided (its "net capture"). JA_ [89.Fed.Reg.at.81623,81692–93]. Although less common, some exchanges utilize a "taker-maker" model, in which they charge the liquidity provider and pay a rebate to the liquidity taker. JA_ [89.Fed.Reg.at.81645n.368]. Many exchanges charge the maximum allowable access fee and rebate nearly all of it, a scenario that, in adopting Regulation NMS, the Commission warned could undermine price transparency and discovery. *See* JA_ [89.Fed.Reg.at.81656,81685,81698]; 70 Fed. Reg. at 37545.

Following significant debate over exchange fee structures, the Commission in 2018 adopted a Transaction Fee Pilot ("TFP") to test the

effects of transaction fees and rebates on market quality and structure. *Transaction Fee Pilot for NMS Stocks*, 84 Fed. Reg. 5202 (Feb. 20, 2019). The TFP allocated different rules to various groups of NMS stocks traded on exchanges to "facilitate an empirical evaluation of whether the existing exchange transaction-based fee and rebate structure is operating effectively to further statutory goals" and whether regulatory changes should follow. *Id*. at 5202, 5226.  The Commission did not take a side in the "strong disagreement about the impact of exchange fee-and-rebate pricing models." *Id*. at 5214.  And, without anticipating what the data would show, the Commission did not determine the impact of the pilot on market quality or future regulation.  *See, e.g.*, *id*. at 5266.

Finding that it imposed "regulatory requirements merely to secure information that the Commission may or may not use in the future to determine whether there is a problem worthy of regulation," this Court vacated the TFP.  *NYSE v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020) (cleaned up).  The Court held that the Commission could not impose a rule "just to gather data" without first identifying "problems with the existing regulatory requirements it meant for the Rule to correct."  *Id*. at 554, 557.  While "nobody disputes that [Section 23 and Section 11A of the Exchange Act] authorize the Commission to change the cap," the concurrence explained, "[t]he Commission needed to take the position that there is a problem in its markets before it could determine whether its Pilot was an appropriate and necessary step towards a solution."  *Id*. at 560 (Pillard, J., concurring).

### B. The Rules

#### 1. The Proposed Rules

In 2022, the Commission proposed to amend Regulation NMS to address significant technological advances and changes in market structure since its adoption in 2005. *See* JA__ [87.Fed.Reg.at.80266,80267,80273].

*First*, the Commission proposed to reduce the tick size in Rule 612. JA__ [87.Fed.Reg.at.80267]. The Commission explained that a meaningful number of NMS stocks were now "tick-constrained," meaning that they "are frequently quoted in the smallest increment permitted" and "would experience smaller quoted spreads but for the [tick-size] requirement." JA__ [87.Fed.Reg.at.80274]; *see also* JA__ [87.Fed.Reg.at.80268] (such stocks are "not able to be priced by market forces" and "could be priced more aggressively within the spread than is possible with the current" tick). To improve trading in these stocks, the Commission proposed to lower the tick size below one cent. *See* JA__ [87.Fed.Reg.at.80268–69] (proposing variable tick sizes of $0.005, $0.002, and $0.001).

*Second*, "to accommodate the reduction in the minimum pricing increment," the Commission proposed to reduce Rule 610's access-fee cap. JA__ [87.Fed.Reg.at.80269]. If the tick size were lowered but the access-fee cap were not, fees could exceed half the tick. That, the Commission explained, would cause market distortions and undermine price coherence and transparency. JA__ [87.Fed.Reg.at.80289–90]. To illustrate, consider a tick of $0.005 and a fee/rebate of $0.003. If a maker-taker exchange displayed a protected bid at $10.010 and a taker-maker exchange displayed

a protected bid at $10.005, an investor would take the maker-taker's seemingly higher bid. But the investor would in fact take home only $10.007 from that exchange (after subtracting the fee), whereas they would have taken home $10.008 on the taker-maker exchange (after receiving a rebate). JA_ [89.Fed.Reg.at.81733]. Similarly, if one saw a trade at $10.005 followed by a trade at $10.010 on an exchange, one would think the stock had increased in value. However, if the first order were a market order to buy, the net price would actually be $10.008 (the buyer pays $10.005 + $0.003); meanwhile, if the second order were a market order to sell, the net price would actually be $10.007 (the seller receives $10.010 and pays $0.003 in fees). "The price has fallen, not risen, an effect that only the most sophisticated market participants would be able to discern." *Id.* The Commission proposed lower variable fee caps corresponding to the proposed ticks to counter this inevitability. JA_ [87.Fed.Reg.at.80269,80290].

*Third*, "to facilitate the ability of market participants to understand and calculate the total price of transactions at the time of execution," the Commission proposed to amend Rule 610 to require exchanges to make the amount of fees and rebates determinable at execution. JA_ [87.Fed.Reg.at.80269–70] (explaining that exchange fees are largely calculated at month-end based on total monthly volume, hindering timely evaluation of price, best execution, and order routing). Lastly, the Commission proposed amendments concerning definitions adopted in the

Commission's 2020 Market Data Infrastructure Rule ("MDI Rule"). JA_
[87.Fed.Reg.at.80270].

Over a two-year period, the Commission considered over a thousand comments from a wide range of market participants. Commenters, including petitioners, generally agreed that a reduction in tick size to permit sub-penny quoting was warranted, with many recommending one new tick of $0.005. *See* JA_ [89.Fed.Reg.at.81633,81634–36]; JA_ [Nasdaq.20230330]; JA_ [Cboe.20230331]. A broad range of commenters likewise supported a reduction in the access-fee cap, with many (including petitioners) agreeing that a lower tick called for lower access fees. *See* JA_ [89.Fed.Reg.at.81649,81733]; JA_ [Nasdaq.20230330]; JA_ [Cboe.20230331]. But commenters expressed a wide variety of views on the appropriate cap and on fee/rebate models generally.

## 2. The Final Rules

On September 18, 2024, the Commission unanimously adopted the Rules, with certain modifications in response to comments. As relevant here, the Rules contain two key components.

***The Tick-Size Amendment.*** The Commission amended Rule 612 to reduce the tick size to $0.005 (half a penny) for quotes and orders priced at/above $1 for certain NMS stocks. JA_ [89.Fed.Reg.at.81623]. By "relaxing [the preexisting tick's] constraint on price discovery" for stocks with narrow bid-ask spreads, the Tick-Size Amendment permits "stocks to be priced more efficiently and competitively, therefore lowering costs for

investors," while also "improving liquidity, competition, and price efficiency in the markets."  JA_ [89.Fed.Reg.at.81621].

***The Access-Fee-Cap Amendment.***  To "accommodate the change in tick sizes," *id.*, the Commission reduced the access-fee cap in Rule 610 from $0.003 (30 mils) to $0.001 (10 mils) per share for protected quotations priced at/above $1, and from 0.3% to 0.1% of the quotation price per share for protected quotations priced under $1.  JA_ [89.Fed.Reg.at.81648–49].  As the Commission explained, because "an access fee that is too high when compared to the tick size can create pricing distortions, the access fee caps need to be adjusted in conjunction with the reduction in tick size."  JA_ [89.Fed.Reg.at.81624].  *See supra* 11–12; *see also* JA_ [89.Fed.Reg.at.81651,81682] ("Absent a reduction in the maximum access fee, a round-trip buy and sell for stocks quoted at the new half-penny tick would require paying more in fees (0.60 cents) than in the spread itself (0.50 cents).").  The lower tick size thus could only be implemented with a concomitant lowering of the access-fee cap.  *See also* JA_ [89.Fed.Reg.at.81645,81648,81651,81732–33].[1]

The Commission accordingly adopted the Access-Fee-Cap Amendment, concluding that it would "promote the statutory objectives of

---

[1] The reduced cap also applies to stocks retaining a penny tick: after lowering the cap for stocks with a lower tick, the Commission could not preserve a higher cap for other stocks without "increas[ing] the probability that some stocks will oscillate from one tick size to another," introducing complexity, cost, and operational risk.  JA_ [89.Fed.Reg.at.81651,81653,81767].

fair and efficient access to protected quotes," "reduce distortions in the market and preserve the integrity of displayed prices," "improve[] market quality," and "yield savings for investors." JA_ [89.Fed.Reg.at.81649]. In particular, it determined that the reduced cap will benefit investors by reducing the distortive effects of fees and rebates, improving price transparency by "providing quotations that are more accurate and reflective of market forces." JA_ [89.Fed.Reg.at.81621]; *see also, e.g.*, JA_ [89.Fed.Reg.at.81624,81648,81656]. By reducing incentives for complex order types, routing strategies, and fee schedules, a lower access-fee cap will also reduce market complexity and fragmentation, and it will mitigate the potential conflicts of interest that fees and rebates raise for a self-interested broker to route customer orders "to receive higher rebates or avoid higher fees based on [his] own economic interest." JA_ [89.Fed.Reg.at.81624]; *see also* JA_ [89.Fed.Reg.at.81647–48,81657,81740–42].

Relying on the voluminous comment file, data, scholarship, and analysis of economic principles, the Commission further predicted that the Access-Fee-Cap Amendment would improve market quality and lower transaction costs. *See* JA_ [89.Fed.Reg.at.81656–57,81685–88,81732–41]. The Commission determined that for stocks not constrained by tick size, transaction costs should "remain largely unchanged" by fee-cap changes "as spreads will adjust on average to offset the reduction in access fees and rebates." JA_ [89.Fed.Reg.at.81657]; *see* JA_ [89.Fed.Reg.at.81685–88] (explaining that because the fee and rebate

15

change by the same amount, "both the supply curve and the demand curve shift [by the same amount and] intersect at the same quantity of liquidity"); JA_ [89.Fed.Reg.at.81736–38].

For tick-constrained stocks, however, where spreads cannot narrow in response to fees and rebates, "reducing the access fee significantly reduces the cost of demanding liquidity." JA_ [89.Fed.Reg.at.81649&n.413,81741]. The lower fee cap will also lower costs to access protected quotations priced under $1, for which exchanges generally have not provided rebates. JA_ [89.Fed.Reg.at.81736]. And, because transaction costs at exchanges should remain unchanged or improve, the Commission found it unlikely that significant order flow would be driven off-exchange; rather, "activity may come on-exchange as a result of the lower access fee cap." JA_ [89.Fed.Reg.at.81762].

In lowering the cap, the Commission declined invitations to eliminate or more drastically cut fees and rebates. JA_ [89.Fed.Reg.at.81650–51,81657–58]. The Commission acknowledged that trading centers should be able to charge reasonable fees for execution services and that "prohibiting access fees entirely would unduly harm the business model." JA_ [89.Fed.Reg.at.81650]. But the Commission sought to "strike[] an appropriate balance" that would "allow the exchanges to provide execution services using their current business models, innovate and compete for order flow, while also reducing the costs to investors who must access protected quotations." JA_ [89.Fed.Reg.at.81658,81659].

The Commission determined that a new cap of 10 mils for protected quotes priced at/above $1 would "appropriately accommodate[]" and "balance" those interests. JA_ [89.Fed.Reg.at.81659]. The Commission estimated that "most exchanges, on average, earn approximately 2 mils per transaction" after assessing fees and disbursing rebates, with a "range from approximately 2 to 6 mils." *See* JA_ [89.Fed.Reg.at.81649n.411,81658,81696]. A 10-mil cap, the Commission reasoned, was sufficiently above this "net capture" to permit exchanges to maintain their current operations and to support a diversity of fee structures and business models. At the same time, the amount was low enough to restore price coherence with the lower tick size and to seek to maximize the benefits of a smaller cap (among them, improved price transparency and lower transaction costs). *See, e.g.*, JA_ [89.Fed.Reg.at.81768] (explaining that a higher cap would increase transaction costs and diminish price transparency, whereas a lower cap would not afford exchanges sufficient flexibility to retain this net capture). The Commission also observed, as it had in Regulation NMS, that this figure was generally consistent with the fees assessed by other trading centers. JA_ [89.Fed.Reg.at.81649&n.410,81659&n.612]. For protected quotes priced under $1, the Commission set a new cap of 0.1%, a corresponding reduction needed to align with the 10 mils cap and avoid distortions as stocks cross the $1 threshold. *See* JA_ [89.Fed.Reg.at.81662,81736,81740].

In selecting the cap, the Commission considered petitioners' alternative "two-tier approach," which would apply an access-fee cap of 15 mils to protected quotes priced at/above $1 for NMS stocks assigned a half-penny tick and an unchanged cap of 30 mils for protected quotes priced at/above $1 for NMS stocks retaining a penny tick. JA_ [89.Fed.Reg.at.81766–67]. "Commenters recommending this alternative did not address the treatment of sub $1.00 stocks." JA_ [89.Fed.Reg.at.81767n.1806]. The Commission, however, concluded that the proposal would increase complexity and cost without any offsetting gain. JA_ [89.Fed.Reg.at.81767–68]. As the Commission explained, such a non-uniform cap would "raise costs by causing stocks to oscillate between the two tick sizes, resulting in the tick size being consistently mis-assigned" in a detrimental "feedback loop scenario." JA_ [89.Fed.Reg.at.81767]. It would also negatively impact protected quotes in stocks priced under $1, causing distortions and discontinuities for stocks trading at the $1 threshold and placing certain stocks at a competitive disadvantage. JA_ [89.Fed.Reg.at.81767–68].

Finally, the Commission considered the possibility of adopting a higher or lower uniform cap and discussed why a cap of 10 mils better balanced the importance of avoiding market distortions, improving price transparency, and lowering costs with preserving trading centers' ability to

operate, innovate, and compete.  JA_ [89.Fed.Reg.at.81768]; *see also, e.g.*, JA_ [89.Fed.Reg.at.81649,81659,81660,81662].[2]

### C.    Procedural History

Petitioners filed a petition for review on October 30, 2024.  On December 12, 2024, the Commission agreed to stay the Tick-Size and Access-Fee-Cap Amendments pending judicial review.  *Nasdaq, Inc.*, Exchange Act Release No. 34-101899, 2024 WL 5094955 (Dec. 12, 2024).

**STANDARD OF REVIEW**

The Access-Fee-Cap Amendment may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2).  Questions of statutory interpretation are reviewed *de novo.  United States Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024).  The arbitrary-and-capricious standard is "[h]ighly deferential" and "presumes the validity of agency action, requiring [this Court] to determine whether the agency has considered the relevant factors" and articulated "a rational connection between the facts found and the choice made."  *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

---

[2] The Commission also added subpart (d) to Rule 610 as proposed, JA_ [89.Fed.Reg.at.81624,81664] (requiring exchange fees and rebates be determinable at the time of execution), and it amended and accelerated implementation of certain MDI Rule definitions largely as proposed, JA_ [89.Fed.Reg.at.81621].  Petitioners do not challenge these portions of the Rules.

## SUMMARY OF ARGUMENT

I.  In the rulemaking below, numerous market participants—including petitioners—recognized that access fees should be reduced to accommodate a reduced tick size.  Petitioners now claim, however, that the Commission cannot set an industry-wide cap at all, but instead must undertake an "individualized" assessment of the fees charged by each of the 16 equities exchanges.  That is incorrect.  The Rules fit comfortably within the Commission's rulemaking authority to ensure that orders in NMS securities are directed "in a manner consistent with the establishment and operation of a national market system," 15 U.S.C. 78k-1(c)(1)(E), 78w(a)(1), and to "assure" the "fairness and usefulness" of "information with respect to quotations for and transactions in such securities," 15 U.S.C. 78k-1(c)(1)(B)).  Petitioners' contrary arguments misconstrue both the amendment and the relevant statutory provisions.

II.  Having concluded that a reduction in tick size was warranted—a decision petitioners do not challenge—the Commission reasonably determined that it needed to also reduce the access-fee cap.  Petitioners' attempt to portray the Access-Fee-Cap Amendment as an unreasoned reprise of the vacated TFP ignores that impetus for the amendment as well as the critical differences in the two regulations' aims, scope, and impact.  Nor do petitioners identify any reason to second-guess the Commission's reasonable policy judgment in favor of their preferred fee level.  The Commission thoroughly and thoughtfully explained why a fee-cap reduction would benefit investors by, among other things, lowering costs

and mitigating potential conflicts of interest, while preserving exchanges' ability to innovate and compete for order flow. And the Commission reasonably explained how it arrived at the new fee-cap figure by balancing several competing factors, including the desire to reduce distortions and costs and a commitment to preserving exchanges' flexibility to sustain their business models.

## ARGUMENT

### I. The Access-Fee-Cap Amendment falls squarely within the Commission's statutory authority to oversee the national market system.

For two decades, Rule 610(c) has imposed upper limits on the fees trading centers may charge for access to protected quotations. Trading centers are free to select fees as they choose within those limits, leaving "[c]ompetition [to] determine which strategy is most successful." 70 Fed. Reg. at 37545–46. In this rulemaking, the Commission reduced the access-fee cap "to prevent introducing new pricing distortions in the market" as a result of the reduced tick size. JA_ [89.Fed.Reg.at.81645]. Both petitioners supported reducing the tick size and acknowledged the link between tick size and access fees, with Nasdaq proposing a reduction to 15 mils for affected stocks. JA_ [Nasdaq.20230330]; JA_ [Cboe.20230324].

Unsatisfied with the Commission's choice of 10 mils, petitioners have changed course. They now challenge the Commission's authority to limit access fees at all under Rule 610(c). But because the Order Protection Rule and Tick-Size Amendment cannot function sensibly in the absence of access-fee caps, those caps are a "necessary or appropriate" means of

21

carrying out the statutory directives those policies implement and, more broadly, ensuring the fair and efficient operation of the NMS. *See* 15 U.S.C. 78k-1(c)(1)(E)–(F), 78w(a)(1). And capping access fees also falls well within the Commission's authority to "assure" the "fairness and usefulness" of "information with respect to quotations for and transactions in [NMS] securities." 15 U.S.C. 78k-1(c)(1)(B).

### A.  Multiple Exchange Act provisions authorize access-fee caps.

Section 11A(a)(2) directs the Commission to use its authority under the Act to facilitate the establishment of a national market system in accordance with and in furtherance of Congress's specific findings and objectives. 15 U.S.C. 78k-1(a)(2). Those objectives include the "economically efficient execution of securities transactions," the "availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities," and the "practicability of brokers executing investors' orders in the best market." *Id.* 78k-1(a)(1)(C). The "authority" available to the Commission to facilitate those objectives includes Section 11A(c)(1)'s direction to the Commission to adopt rules to "assure that all exchange members, brokers, and dealers transmit and direct orders" in NMS securities "in a manner consistent with the establishment and operation of a national market system," *id.* 78k-1(c)(1)(E), and to "assure ... the fairness and usefulness" of "information with respect to quotations for and transactions in such securities," *id.* 78k-1(c)(1)(B). The Commission is also authorized to "make such rules and

regulations as may be necessary or appropriate to implement the provisions of [the Act]." 15 U.S.C. 78w(a)(1).

As the Commission explained in 2005, an access-fee cap is "necessary" to comply with the rulemaking directives in Section 11A(c)(1). 70 Fed. Reg. at 37545. For the NMS to operate fairly and efficiently, "orders must be routed to those markets displaying the best-priced quotations," as the Order Protection Rule requires. *Id.* But that function "would be thwarted if market participants were allowed to charge exorbitant fees that distort quoted prices" and disrupt the routing of orders to the venue with the best price. *Id.* A "fee limitation" is "necessary to support the integrity of the price protection requirement ... [and to ensure] the fairness and efficiency of the NMS." *Id.* at 37503.

Similarly, the Tick-Size Amendment ensures that orders are transmitted in price increments that appropriately balance the NMS goals of "price competition" and "incentives for liquidity provision." JA_ [89.Fed.Reg.at.81683]; *also* JA_ [89.Fed.Reg.at.81622]. The tick size cannot be reduced in line with these goals without also adjusting the access-fee caps to preserve price coherence and avoid market distortions. JA_ [89.Fed.Reg.at.81682,81732].

Nor can the Commission assure the "fairness and usefulness" of quotation information if it is unable to set a limit on the fees trading centers charge to access protected quotations. 15 U.S.C. 78k-1(c)(1)(B). "For quotations to be fair and useful, there must be some limit on the extent to which the true price for those who access quotations can vary from the

displayed price." 70 Fed. Reg. at 37545. Capping access fees provides that limit by "assur[ing] order routers that displayed prices are, within a limited range, true prices." *Id.* at 37502; *see also id.* at 37583 ("The wider the disparity in the level of access fees among different market centers, the less useful and accurate are the prices of displayed quotations."). It also prevents trading centers from taking improper advantage of the Order Protection Rule by charging high fees to access their protected quotes, which "would detract from the usefulness of quotation information and impede market efficiency and competition." *Id.* at 37584. And the Commission reduced the access-fee cap here to address pricing distortions that can occur when those fees are too high compared to the tick size. JA__ [89.Fed.Reg.at.81624].

Because access-fee caps are necessary and appropriate to carry out Congress's directives in Section 11A, the Access-Fee-Cap Amendment falls squarely within the Commission's authority. *See NYSE*, 962 F.3d at 560 (Pillard, J., concurring) ("[N]obody disputes that [Sections 11A and 23 of the Act] authorize the Commission to change the [access-fee] cap.").[3]

---

[3] Because the "plain language and structure" of the statute confirm the Commission's authority to limit access fees, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), is irrelevant. *Contra* Br. 30. To the extent petitioners suggest *Loper Bright* establishes a clear statement rule, they misread the decision. The Court affirmed that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency"—including through broad "term[s] or phrase[s] ... such as 'appropriate' or 'reasonable'"—the reviewing court's role is simply to interpret "the boundaries of the delegated authority" and "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries." 144 S. Ct. at 2263 (cleaned up).

### B. Petitioners' contrary arguments are meritless.

Petitioners do not dispute that "protecting the best displayed prices against trade-throughs would be futile if broker-dealers and trading centers were unable to access those prices fairly and efficiently," 70 Fed. Reg. at 37502, or that the access-fee caps "need[ed] to be adjusted in conjunction with the reduction in tick size," JA_ [89.Fed.Reg.at.81624]. Nor do they dispute that access fees can undermine the "fairness and usefulness" of quotation "information." Instead, they assert that the Commission has no authority to regulate exchange fees except on an "individualized" basis through its oversight of exchange rules under Section 19 of the Exchange Act. Br. 27. But petitioners misconstrue the role of Section 19 in the statutory scheme and its relation to Section 11A and the NMS.

Section 19 governs the Commission's oversight of individual self-regulatory organizations, including exchanges, and provides the procedures and standards by which the Commission approves or disapproves changes in the rules for each individual exchange, including its fees. The Commission's rulemaking authority under Sections 11A and 23(a)(1), in contrast, extends to all trading centers, 15 U.S.C. 78k-1(c)(1), allowing the Commission to fulfill Congress's directive to facilitate the creation and operation of the NMS as a whole.

Petitioners incorrectly assert that Rule 610(c) "regulate[s] exchange fees," thus requiring use of "the congressionally specified mechanism" for approving or modifying exchange-initiated fees under Section 19. Br. 25, 29. Under that procedure, the Commission "shall" approve an exchange's

proposed rule change if, after notice and comment, it finds that the proposal is "consistent with" requirements of the Act, 15 U.S.C. 78s(b), including Section 6(b)(4)'s requirement that an exchange's rules "provide for the equitable allocation of reasonable dues, fees, and other charges," *id.* 78f(b)(4). An exchange rule to establish or change a fee takes effect "upon filing," but the Commission may temporarily suspend the rule and institute proceedings to determine whether to approve or disapprove it. *Id.* 78s(b)(3).

But Rule 610(c) does not establish or modify any *exchange* fee. It caps the fees that any "trading center" can charge to access protected quotations. 17 C.F.R. 242.610(c). A "trading center" can be "a national securities exchange or national securities association that operates an SRO trading facility, an alternative trading system, an exchange market maker, an OTC market maker, or any broker or dealer that executes orders internally." 17 C.F.R. 242.600(b)(106) (defining). Although today exchanges are the only trading centers that display protected quotations (JA_ [89.Fed.Reg.at.81645n.367]), that was not the case when Rule 610(c) was adopted and may not be the case in the future. Reaching this broader set of market participants is critical to achieving the statutory goals of preserving the benefits of price protection and ensuring the fairness and usefulness of quotation information. JA_ [89.Fed.Reg.at.81624].

Not only is Section 19 an odd fit for this kind of market-wide initiative, but petitioners overread the import of Section 19(b)'s "individualized review" process. Br. 29. Petitioners assert that the

26

existence of this process precludes the adoption of an access-fee cap across all exchanges. Br. 27–29. That argument is belied by the plain language of Section 19 itself, as Section 19(c) broadly empowers the Commission to "abrogate, add to, and delete from" exchange rules as it "deems necessary or appropriate ... in furtherance of the purposes of" the Act. 15 U.S.C. 78s(c). The Commission could thus require every exchange to adopt a uniform rule with respect to access fees.

Moreover, Section 19(c) dictates that "[n]othing in this subsection shall be construed to impair or limit the Commission's power" to regulate exchanges directly "pursuant to any other authority under [the Act]"— including Section 11A(c)(1). *Id.* 78s(c)(4). As the Senate Report makes clear, "[w]here the SEC has direct authority with respect to a specific subject matter and a self-regulatory organization also exercises authority in the area, the SEC may change regulatory policy ... by promulgating its own substantive rule preempting self-regulatory rules on the subject" and "section 19(c) ... in no way limits the SEC's ability to use [this] power." S. Rep. No. 94-75, at 131.

Petitioners claim (Br. 26–31) that Section 11A(c)(1) cannot authorize access-fee caps because other Exchange Act provisions specifically mention "fees" and Section 11A(c)(1) does not. That argument is a case study in the misuse of that interpretive principle. As the Supreme Court cautioned in the very case petitioners cite, "[c]ontext counts, and it is sometimes difficult to read much into the absence of a word that is present elsewhere in a statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023). A negative

inference thus has "limited force" where the provisions "use different words and are not otherwise parallel," *Nat'l Postal Policy Council v. Postal Regulatory Comm'n*, 17 F.4th 1184, 1191 (D.C. Cir. 2021), with any such inference "grow[ing] weaker with each difference in the formulation of the provisions under inspection," *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) ("negative inference" arguments are weak when provisions address different issues); *Field v. Mans*, 516 U.S. 59, 75 (1995) ("The more apparently deliberate the contrast, the stronger the inference.").

Here, no plausible negative inference can be drawn. Section 11A(c)(1) permits regulation of a broad range of market participants to "assure," among other things, that orders in NMS securities are "transmit[ted] and direct[ed] ... in a manner consistent with the establishment and operation of [the NMS]" and that quotation information is "fair[] and useful[]" across the NMS. 15 U.S.C. 78k-1(c)(1). The three provisions petitioners cite address different subject matter, use different language, regulate different entities, and serve different purposes. Given these "fundamentally different" provisions, petitioners' argument is "unpersuasive." *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 772 (D.C. Cir. 2019).

The Commission's authority to charge "transaction fees and assessments" to recover the cost of its annual budget, 15 U.S.C. 78ee(a), and to "abrogate" exchange rules that impose fixed-rate brokerage commissions, *id.* 78f(e)(2), thus does not impliedly limit its authority to

regulate an entirely different type of fee under Section 11A. *See* S. Rep. No. 94-75, at 8–9 (Sections 11A(a) and 11(c) "clearly grant[] the Commission broad authority to oversee the implementation, operation, and regulation of the [NMS]."). And Congress could not have been clearer that the Commission's responsibility to ensure that proposed exchange rules "provide for the equitable allocation of reasonable … fees," 15 U.S.C. 78f(b)(4), "shall [not] be construed to impair or limit" the Commission's authority to regulate such matters directly under Section 11A, *id.* 78s(c)(4); *see also* S. Rep. No. 94-75, at 131.

Moreover, as discussed, the Commission's authority under Section 11A(c)(1) extends to all trading centers, including ATSs and broker-dealers that execute orders internally. *Id.* 78k-1(c)(1). There is no basis to presume that, in providing for review of exchange fees under Section 19, Congress intended to deprive the Commission of authority to regulate fees charged by these other venues. And construing Section 11A(c)(1) to permit regulation only of non-exchange trading center fees would contradict Congress's goal of ensuring "equal regulation of" and "fair competition among" all markets and broker-dealers. *Id.* 78k-1(a)(1)(C)(ii), (c)(1)(F); *see Field*, 516 U.S. 75 (negative inference "weakest" when "at odds with other textual pointers").

## II.  The Access-Fee-Cap Amendment is reasonable and reasonably explained.

The Commission extensively detailed why the Access-Fee-Cap Amendment represented a necessary and appropriate response to the Tick-Size Amendment, benefitted investors, and reflected a reasonable balancing of complex and conflicting policy objectives.  Neither petitioners' preoccupation with the TFP nor their dissatisfaction with the conclusions drawn by the Commission undermines that reasoned judgment.

### A.  The TFP is a red herring.

In erroneously asserting that the Commission failed to explain alleged inconsistencies with the TFP (Br. 36), petitioners mischaracterize the Access-Fee-Cap Amendment as "nothing more than a warmed-over rehash of the Fee Pilot" (Br. 34).  But the two regulations differ in critical ways, including, importantly, in the regulatory problem identified and the solution provided, and the Commission was not required to justify its supposed divergence from a distinct initiative.

### 1. The TFP and Access-Fee-Cap Amendment are fundamentally different.

Contrary to petitioners' assertions, the TFP bears little relation to, and has little bearing on, the Access-Fee-Cap Amendment.  The TFP was a "one-off" data-gathering initiative, designed to help the Commission assess regulation of exchange fee-and-rebate models.  *NYSE*, 962 F.3d at 546.  It imposed varying fee-and-rebate structures on test groups of stocks traded on exchanges to create data the Commission could use to "consider whether to regulate in the future."  *Id.*  In doing so, this Court found, the TFP did not

identify a regulatory problem that it aimed to solve, nor did it stake out a "position [or] plan." *Id*. at 567. The Court thus vacated the TFP because its "regulatory requirements … were adopted to collect data," rather than to serve a "regulatory agenda." *Id*. at 555.

The Access-Fee-Cap Amendment is entirely different. Far from "the *same* fee-cap reduction it had planned to test in the pilot" (Br. 23), the Access-Fee-Cap Amendment covers different entities (all trading centers, versus only certain exchanges) and affects different stocks (all NMS stocks, versus only certain stocks over a price threshold). It imposes different regulatory changes (a consistent fee-cap reduction, versus a time-limited experiment involving a fee-cap reduction, a rebate ban, or the status quo). *Compare, e.g.*, JA\_ [89.Fed.Reg.at.81644], *with* 84 Fed. Reg. at 5203.

And, crucially, it serves different ends: where the TFP was a data-gathering exercise, the Access-Fee-Cap Amendment is a regulatory change necessitated by the widely-supported Tick-Size Amendment. Though petitioners barely mention the Tick-Size Amendment in their brief, the Commission repeatedly made clear that the Access-Fee-Cap Amendment follows directly from that change. *See, e.g.*, JA\_ [89.Fed.Reg.at.81624,81645,81651,81772]; *see also* SIFMA Br. 4 (explaining that the two amendments are a "package deal"). Indeed, petitioners do not dispute that the tick-size reduction (which they too supported) required an access-fee reduction. *See* JA\_ [Nasdaq.20230330] ("Nasdaq supports … adding one tick size below one penny—at $0.005—[and …] supports adjusting the access fee cap to accommodate new tick

sizes ... ."); JA_ [Cboe.20230324] ("We acknowledge that a reduction in quoting increments for tick constrained symbols could make it advisable for market centers to reduce access fees ... ."); Br. 59 (conceding that the amendments are "[i]nextricably [i]ntertwined").  Impelled to adjust the access-fee cap to "accommodate the change in tick sizes," JA_ [89.Fed.Reg.at.81621], the Commission accordingly determined what particular access fee-cap adjustment would best serve investors and markets.  *See, e.g.*, JA_ [89.Fed.Reg.at.81648–49] (concluding that the Access-Fee-Cap Amendment "also should help to reduce distortions and complexities" and "yield savings for investors").  A different response to a different problem, the Access-Fee-Cap Amendment stands apart from the TFP.

### 2. There is no "change in position" from the TFP.

Petitioners' contention (Br. 32–36) that the Commission failed to explain an alleged "change in position" from the TFP, as required under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), likewise fails.  *Fox* counseled that agencies must acknowledge "action representing a policy change," and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *Id.* at 515–16.  And an agency must provide "a reasoned explanation" for disregarding any contradictory "factual findings ... which underlay its prior policy" or any "serious reliance interests" engendered by that policy.  *Id.*

The Access-Fee-Cap Amendment, however, does not represent any "policy change" or "change in position" from the TFP.  As this Court

emphasized, the TFP "took no position" and espoused no policy. *NYSE*, 962 F.3d at 546. It was "adopted to collect data," "without a regulatory agenda," and was vacated because it uniquely declined to assert a policy or position. *Id.* at 554–55; *see also id.* at 567–68 (Pillard, J., concurring). By failing to "identify a[] problem[]," "pick a side," or "assess the effects," it did not make essential factual findings and it did not engender serious reliance interests. *Id.* at 545, 555, 567. This is hardly the kind of "policy" requiring explication envisioned by *Fox. Cf. Fox*, 556 U.S. at 515 (requiring agencies to address "prior policy" or "rules that are still on the books"); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C. Cir. 2017) (requiring explanation for "depart[ure] from decades-long past practices and official policies").

Unable to identify any shift in "policy" or "practice," petitioners scold the Commission for failing to "acknowledge its prior uncertainty about the numerous complicated questions implicated by exchanges' fees and rebates." Br. 5. Again, however, petitioners ignore the fundamentally different context and content of the Access-Fee-Cap Amendment. The Commission explained at length why the Tick-Size Amendment necessitated a change in the fee cap, as well as how it chose the new cap; how it expected that cap to impact market quality and structure; and why it reached those conclusions. Petitioners do not explain why the Commission's assessment of how to alter the fee cap in response to the Tick-Size Amendment needed to also note that the Commission had previously found questions concerning exchange fees difficult to resolve,

nor how acknowledging that the Commission had previously "taken no position on the conflicting views" of the fee-and-rebate structures in the TFP would have changed, or aided in understanding, the Commission's analysis. *NYSE*, 962 F.3d at 555.

Nor is there any inconsistency between the so-called "key areas" of "uncertainty" petitioners claim to find in the TFP (Br. 33) and the conclusions drawn by the Commission now. For one, several of the statements petitioners cite concern consequences of the *TFP*—not "reducing access fees" generally, let alone the particular fee-cap reduction adopted here. Br. 32–33; *see* 84 Fed. Reg. at 5277, 5282 (analyzing economic consequences of the TFP). That the Commission reached different conclusions about the effects of a different rule with different terms addressing a different problem should come as no surprise. And, indeed, the Commission's conclusions about the Access-Fee-Cap Amendment's impacts derive in part from elements of that amendment that were not implicated in TFP. *See, e.g.*, *infra* 38 (Access-Fee-Cap Amendment will lower costs for stocks under $1, which were excluded from the TFP), 40 (neutral or improved on-exchange costs should not drive significant activity off-exchange). The Commission's statements concerning potential conflicts of interest likewise are not inconsistent. *See infra* 44.

More generally, there is nothing incompatible with the TFP's quest to aid a "lack of empirical clarity" (Br. 4) on exchange fee structures and the Commission's decision to adopt the Access-Fee-Cap Amendment. As the

Commission observed in adopting the TFP, agencies can regulate in the absence of empirical data, on the basis of "theory" and "expertise"; but, in that particular case, it sought an "empirical assess[ment]" to first determine if a problem warranted regulatory change, 84 Fed. Reg. at 5248, which this Court found exceeded its authority.  *See NYSE*, 962 F.3d at 566.

Again, the circumstances of the Access-Fee-Cap Amendment differ dramatically.  Confronted with an "agreed[-upon] need for Commission action on access fees given the change in the tick size," JA_ [89.Fed.Reg.at.81732], the Commission had to proceed on the basis of the information before it; it could not decline to take a position in the hope of gaining greater "empirical clarity," as it had in the TFP.[4]  To do so, the Commission appropriately evaluated available empirical data as well as economic theory, academic scholarship, thousands of comments received over years, and its decades of experience regulating the NMS.  *See, e.g.*, *Chamber of Com. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005) (explaining that an agency may conduct "a general analysis based on informed conjecture," incorporating "its own and its staff's experience, the many

---

[4] That the Commission also reasonably determined, in support of good governance, to "review and study the effects of [all the Rules'] amendments in the national market system," JA_ [89.Fed.Reg.at.81703], hardly bespeaks "lingering doubts" about the Access-Fee-Cap Amendment (Br. 34), nor is it unique either to this amendment or to these Rules.  *See, e.g.*, *Securities Transaction Settlement Cycle*, 82 Fed. Reg. 15564, 15582–83 (Mar. 29, 2017); *Crowdfunding*, 80 Fed. Reg. 71388, 71390 (Nov. 16, 2015).

comments received, and other evidence, in addition to the limited and conflicting empirical evidence" (cleaned up)).

Petitioners' suggestion that the Commission was required to identify "new empirical evidence" "post-dating the Fee Pilot Rule" before it could amend the access-fee caps (Br. 23) runs headlong into the Supreme Court's directive that, "[i]n the absence of additional data from commenters," an agency is free to make "a reasonable predictive judgment based on the evidence it ha[s]." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021); *cf. also Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 15 (D.C. Cir. 2015) (rejecting "bare assertion that [the agency] needed to provide fresh empirical support"). After considering a variety of information both pre- and "post-dating" the TFP, including comments, scholarship, and data, the Commission thoroughly explained how and why it determined to reduce the cap along with the likely economic effects of its action. *See, e.g.*, JA_ [89.Fed.Reg.at.81698–99,81737]. No more is required.

**B.** **The Commission reasonably explained why the Access-Fee-Cap Amendment will benefit investors.**

Petitioners next assert that the Commission failed to adequately explain why the Access-Fee-Cap Amendment will benefit investors, critiquing three aspects of its expected impact. The Court's review, however, is "particularly deferential in matters such as this, which implicate competing policy choices, technical expertise, and predictive market judgments." *AD HOC Telecomms. Users Comm. v. FCC*, 572 F.3d 903, 908

36

(D.C. Cir. 2009)  In making its predictive judgments here, the Commission more than satisfied its obligation to "acknowledge factual uncertainties and identify the considerations it found persuasive." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020).

### 1. Transaction Costs

Contrary to petitioners' argument (Br. 36–38), the Commission reasonably explained why the Access-Fee-Cap Amendment is expected to lower transaction costs for investors. *See, e.g.*, JA_ [89.Fed.Reg.at.81684–88, 81692–99,81736–38,81765].  It specifically assessed the likely impact for three different categories of NMS stocks.

First, for non-tick-constrained stocks with protected quotations priced at/above $1, the Commission described why it anticipated transaction costs would "remain largely unchanged."  JA_ [89.Fed.Reg.at.81657].  In doing so, the Commission appropriately considered the "net cost (or net spread)," inclusive of fees and rebates, rather than the quoted spread.  JA_ [89.Fed.Reg.at.81687n.1017]; *see also* JA_ [89.Fed.Reg.at.81765,81685n.1012] ("[L]iquidity providers are indifferent between receiving compensation in the form of spread or in the form of a rebate; similarly, liquidity demanders are indifferent between paying the spread or access fee … .").  The Commission then explained that, because access fees and rebates move in tandem, the level of fees and rebates should not alter the net cost of trading; rather, they serve to shift the quoted spread by the same amount.  JA_ [89.Fed.Reg.at.81685–88,81737].  Specifically, "[w]hen the fees and rebates change together,

supply and demand intersect at the same quantity point (thus liquidity offered would be unchanged) but at a different price point [and the] net spread (the net cost of trading), which takes into account the fees and rebates, would be unchanged." *Id.*; *also* JA__ [89.Fed.Reg.at.81682] ("While the quoted spread may be lower [when it includes fees and rebates], the cost to investors is not; this is because gains from the lower spread are counteracted by the access fee.").  As a result, spreads adjust and transaction costs for these stocks remain largely unchanged.  JA__ [89.Fed.Reg.at.81657].

The Commission then explained why the Access-Fee-Cap Amendment would lower costs for tick-constrained and sub-$1 stocks. "[L]owering the access fees" for tick-constrained stocks eliminates "artificially high" prices caused by a "quoted spread [that] cannot fall to compensate for the rebate" and a "supply of liquidity [that is] distorted," which "lowers rents and improves market quality, making it cheaper to transact for investors."  JA__ [89.Fed.Reg.at.81688]; *also* JA__ [89.Fed.Reg.at.81649n.413].  And for protected quotes in NMS stocks priced under $1, which do not generally receive rebates, "the access fee only serves to increase the cost of taking liquidity," making a fee reduction a direct cost reduction.  JA__ [89.Fed.Reg.at.81736].

This analysis was appropriately grounded in economic theory as well as real-world experience and data.  *See, e.g.*, JA__ [89.Fed.Reg.at.81685–88] (economic model and supporting scholarship and comments); JA__ [89.Fed.Reg.at.81737] (discussing an "empirical result" "consistent with

the model presented"). Petitioners denigrate the Commission's assessment as "merely an academic exercise" lacking "concrete data" (Br. 40), but "an agency need not—indeed cannot—base its every action [solely] upon empirical data," *Nasdaq*, 38 F.4th at 1142 (cleaned up). Rather, it retains "considerable latitude in [determining the] methodology responsive to its regulatory challenge," *Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1037 (D.C. Cir. 1977), and, as here, may "rely on basic economic theory, including relying on generic factual predictions, as long as the agency explains and applies the relevant economic principles in a reasonable manner," *Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 858 (D.C. Cir. 2023) ((cleaned up). *See also, e.g.*, *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014) ("[T]he Commission is free to act based upon reasonable predictions rooted in basic economic principles."). The Commission's extensive analysis here more than "suffices to sustain [the Commission's predictive] judgment." *Citadel*, 77 F.4th at 858.

Petitioners also err in contending that the Commission ignored certain "concerns" that a fee-reduction "could actually *increase* transaction costs." Br. 37. While petitioners claim that "wider spreads" mean, "by definition, increase[d] costs for investors" (Br. 38), the Commission repeatedly explained why a fee-cap reduction would result in "higher quoted spreads *without* an increase in transaction costs." JA_ [89.Fed.Reg.at.81767 (emphasis added); *also* JA_ [89.Fed.Reg.at.81740, 81682]. While a change in fees and rebates may cause a "wider quoted spread," the Commission explained, the "net spread (the net cost of

trading), which takes into account the fees and rebates, would be unchanged." JA_ [89.Fed.Reg.at.81737].  Indeed, "the fact that the [Tick-Size Amendment] will lower spreads means that the two amendments combined may in fact lead to lower quoted spreads on some stocks." JA_ [89.Fed.Reg.at.81736].  The Commission similarly addressed (*contra* Br. 37) why the Access-Fee-Cap Amendment should not reduce quoted depth, JA_ [89.Fed.Reg.at.81765], nor increase costs for less liquid securities, JA_ [89.Fed.Reg.at.81740].

### 2. Order Flow

The Commission likewise reasonably explained its conclusion that the Access-Fee-Cap Amendment would not drive significant order flow from exchanges.  JA_ [89.Fed.Reg.at.81762]; *contra* Br. 39.  As the Commission recounted, exchanges compete for order flow based on several factors, including, importantly, fees and price improvement.  JA_ [89.Fed.Reg.at.81701].  Because the cost of transacting on-exchange will be unchanged or improved under the Access-Fee-Cap Amendment, the Commission found that market participants will have the same, if not greater, incentive to trade on exchange.  *See* JA_ [89.Fed.Reg.at.81738].  "[L]iquidity providers would not be deterred from quoting on exchange because they could widen the quote, thereby receiving the same economic profit as they received with the rebate," and "[l]iquidity demanders would not be worse off because the reduction in access fee would offset, or, in the case of stocks with an economic spread of less than a tick, more than offset, the increase in spread."  *Id.*  Put another way, off-exchange liquidity would

not attract more takers because it "compete[s] with on-exchange liquidity," which "is now less expensive to access due to a lower access fee cap." *Id.* This commonsense conclusion cannot be dismissed as unreasoned "speculation" (Br. 40) simply because it was grounded in economic principles rather than empirical data. *See supra* 38–39.

Nor do petitioners identify any "empirical evidence" of competitive harm that the Commission failed to consider. *Contra* Br. 40. While petitioners claim the Commission overlooked that "access-fee-funded rebates are necessary to enable exchanges to compete for order flow" due to off-exchange venues' alleged advantages (Br. 41), the Commission reasonably explained that it "disagree[d] that rebates are essential to attract liquidity on national securities exchanges or the only means of attracting liquidity." JA\_ [89.Fed.Reg.at.81656]. Among other things, the argument that "a premium [in the form of a rebate] is necessary to compete with the off-exchange market" "does not take into account the access fee, which (all else equal) discourages liquidity takers from accessing exchanges." JA\_ [89.Fed.Reg.at.81738]. It also ignores that "a premium can come in the form of the spread as opposed to a rebate." *Id.*; *see also* JA\_ [89.Fed.Reg.at.81661] ("[L]iquidity providers are able to post bid and offer prices that account for the risk of displaying protected quotations without needing the payment of a rebate.").

More generally, the Commission explained, markets have "significant incentives to be near the top in order-routing priority and displaying the best protected quotation will attract liquidity to a market." JA\_

[89.Fed.Reg.at.81656] (cleaned up). And contrary to petitioners' claim that rebates are "essential" to on-exchange liquidity, "the access fee caps were not established to support trading centers' ability to offer rebates," *id.*, about which the Commission in fact expressed some concern when adopting Regulation NMS, 70 Fed. Reg. at 37545. Rather, they "were designed to protect limit orders and to assure that orders could be routed to those markets that were displaying the best-priced quotations," leaving it "to the markets and competition to determine what strategies would be successful in attracting order flow, subject to the maximum access fee cap." JA__ [89.Fed.Reg.at.81656].

Whatever the current differences between off- and on-exchange venues, the Commission reasonably concluded that the Access-Fee-Cap Amendment preserves exchanges' ability to use fee-and-rebate structures and preserves (or enhances) exchanges' ability to compete on cost and price. It thus reasonably predicted that "[t]he same opportunities that are available on-exchange in today's environment are still expected to be available ... even under the lower access fee cap," and in fact "are expected to improve" in conjunction with the Tick-Size Amendment. JA__ [89.Fed.Reg.at.81738].

### 3. Conflicts of Interest

Petitioners fundamentally misunderstand the Commission's conflicts-of-interest analysis and its role in the Access-Fee-Cap Amendment's adoption when they accuse the Commission of failing to explain how "conflicts of interest" justify "taking extreme regulatory measures [in the

42

form of the Access-Fee-Cap Amendment]."  Br. 46.  The Commission did not adopt the Access-Fee-Cap Amendment to resolve potential conflicts arising from fee-and-rebate structures; the Commission adopted the Access-Fee-Cap Amendment in response to the Tick-Size Amendment.  *See supra* 14, 31–32.

Having determined (along with the vast majority of commenters) that the Tick-Size Amendment necessitated a fee-cap reduction, the Commission considered the impact of that change on various aspects of the NMS.  One issue commenters raised was the "potential conflict of interest between broker-dealers and their customers" that fee-and-rebate structures pose.  JA_ [89.Fed.Reg.at.81624].  The Commission acknowledged "the existence of [such] potential conflicts of interest," as current fee structures "can create an incentive for a broker-dealer that fully absorbs transaction costs or rebates potentially to route customer orders to an exchange in order to avoid fees that are paid by the broker-dealer or to receive the highest rebate paid."  JA_ [89.Fed.Reg.at.81647]; *see also* JA_ [89.Fed.Reg.at.81657].  It then determined that the Access-Fee-Cap Amendment would "reduce the magnitude" of any "potential conflicts" and "help alleviate" them, in an ancillary benefit to the rule.  JA_ [89.Fed.Reg.at.81647–48].

The Commission did not have to prove that "rebates generate conflicts of interest" in order to "justify taking [a] regulatory measure[]" (Br. 43, 46) that was never focused on tackling them.  Likewise, because the Access-Fee-Cap Amendment was not aimed at reducing conflicts of

interest, the Commission did not need to consider whether other "initiatives may be sufficient to mitigate" them (Br. 46); whatever Rule 610(d) or the (merely proposed) Regulation Best Execution might do for broker-dealer conflicts (Br. 46–48), they cannot resolve how to alter the fee cap as a result of the new tick size.

Petitioners' insistence (Br. 43, 45–46) that the Commission was "inconsistent in its treatment of conflicts of interest" is equally meritless. The Commission has repeatedly identified a potential conflict of interest facing broker-dealers arising from the competing incentives fee-and-rebate models present, while expressing "uncertainty regarding to what degree those potential conflicts of interest are being acted upon," JA_ [89.Fed.Reg.at.81742]. Nothing petitioners cite proves otherwise.

### 4. Other Benefits

Finally, in erroneously arguing that the Commission failed to explain why the Access-Fee-Cap Amendment will benefit investors, petitioners simply ignore the numerous such benefits the Commission identified. As discussed, petitioners turn a blind eye to the critical way in which the Access-Fee-Cap Amendment assures price coherence in the wake of the Tick-Size Amendment. *See supra* 14, 31. They fail to mention that the Access-Fee-Cap Amendment will enhance price transparency and reduce market distortions and complexity. *See supra* 15. And they ignore the costs investors would face in the absence of the Access-Fee-Cap Amendment, whether under alternative fee-cap changes or through (necessarily joint) inaction on both the tick size and the fee cap. *See, e.g.*,

JA__ [89.Fed.Reg.at.81766–68] (explaining why alternatives would increase cost and complexity and diminish benefits); JA__ [89.Fed.Reg.at.81621,81634] (discussing benefits of the Tick-Size Amendment). The Commission thus reasonably determined that the Access-Fee-Cap Amendment will benefit investors, notwithstanding petitioners' dissatisfaction with that judgment.

## C. The Commission drew a reasonable line in the Access-Fee-Cap Amendment.

Unable to impugn the Commission's decision to adjust the access-fee cap, petitioners resort to contesting the number the Commission selected. But the Commission reasonably weighed multiple factors and conflicting objectives in determining that a "10 mil cap strikes an appropriate balance" among the "various competing interests." JA__ [89.Fed.Reg.at.81659]. That petitioners prefer a higher number—one that would afford them higher fees at others' expense—does not render the Commission's decision unreasonable or unreasoned.

### 1. The Commission reasonably balanced competing factors in revising the access-fee cap.

In making regulatory "line-drawing" decisions, agencies have "wide discretion," and are "not required to identify the optimal [number] with pinpoint precision." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 461–62 (D.C. Cir. 2001). "The relevant question is whether the agency's numbers are within a zone of reasonableness" and bear a "relationship to the underlying regulatory concerns." *Id.*; *see also Covad Comm'ns Co. v. FCC*, 450 F.3d

528, 543 (D.C. Cir. 2006) (emphasizing that "in regulatory line-drawing," "[w]e have never required anything more" than that "the Commission confronted the issue[s]" "and made reasonable trade-offs").  Moreover, "[w]hen an agency must balance a number of potentially conflicting objectives" in drawing such a line, "judicial review is [particularly] limited." *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999).

The Commission reasonably "considered and balanced many factors … in coming to the determination that [a] 10 mils access fee cap is appropriate" for protected quotations priced at/above $1.[5]  JA_ [89.Fed.Reg.at.81660].  As the Commission explained, the cap first and foremost had to be "less than one-half of the tick size [to] preserve coherence" and "prevent introducing pricing distortions."  JA_ [89.Fed.Reg.at.81651].  Under that threshold, a lower number would entail lower transaction costs and market complexity and greater price transparency.  *See, e.g.*, JA_ [89.Fed.Reg.at.81768].  At the same time, the number should be high enough to "allow the exchanges to provide execution services using their current business models, innovate and compete for order flow."  JA_ [89.Fed.Reg.at.81658].

Accordingly, the Commission considered exchanges' current net capture rate, which the Commission estimated at around 2 mils.  *See* JA_

---

[5] The Commission also reasonably explained how it arrived at a cap of 0.1% of the quotation price for protected quotations priced under $1, though petitioners do not substantively engage with, let alone criticize, that figure. *See, e.g.*, JA_ [89.Fed.Reg.at.81662,81736&n.1449].

[89.Fed.Reg.at.81649n.411,81658,81696 & nn.1101–05]. The Commission determined that an access-fee cap of 10 mils—a number well above that rate, and "consistent with the range of [fees] assessed by [other] trading centers"—would "appropriately accommodate" and "balance" these "competing interests." JA_ [89.Fed.Reg.at.81659]; *see also* JA_ [89.Fed.Reg.at.81649] ("balanc[ing] the competing interests of reducing the cap to address the amendments to Rule 612 and market distortions associated with the fee/rebate models ... with the importance of preserving the viability of multiple agency market business models").

In selecting this figure, the Commission did not operate "in a binary landscape," as petitioners erroneously contend (Br. 54). The Commission expressly "explore[d other] potential reductions" (Br. 54) and explained why, in its judgment, neither a higher nor lower cap would as effectively balance the competing interests at issue. JA_ [89.Fed.Reg.at.81678] (assessing a "Higher or Lower Uniform Access Fee Cap"). And the Commission specifically considered and rejected the alternative cap cited by petitioners (Br. 54). That proposal would have set the cap at 15 mils for protected quotations at/above $1 with the new tick size, retained the cap at 30 mils for protected quotations at/above $1 with a penny tick, and left unaddressed the treatment of protected quotations below $1. The Commission reasonably concluded that it would "raise costs," "increase complexity," "reduce some benefits," and introduce complications and distortions for stocks at the $1 threshold, without providing any offsetting market benefits. JA_ [89.Fed.Reg.at.81767–68]; *supra* 18.

47

Ultimately, "Congress gave the Commission—not the petitioners or this Court—discretion in regulatory line-drawing" for the NMS. *Covad*, 450 F.3d at 543. The Commission detailed how it "considered and balanced [rival] policy objectives in this complex area and reached an appropriate policy decision." JA_ [89.Fed.Reg.at.81656]; *see Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1110 (D.C. Cir. 2022) (affording the Commission room "to strike a balance between competing statutory objectives"). "The mere fact that the Commission's exercise of its discretion resulted in a line that the [petitioners] would have drawn differently is not sufficient to make it unlawful," *Covad*, 450 F.3d at 543, and petitioners "point to nothing suggesting that the agency abused its discretion in drawing the line at [10] as opposed to [15]," *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000).

## 2. Petitioners' focus on ATS fees is misguided.

As the above discussion shows, petitioners' assertion that the Commission's line-drawing rested "almost exclusively" on a desire to achieve "parity with [ATS] fees" (Br. 49) rings hollow. It is true that the Commission reasonably considered "the rates charged by other trading centers as a factor in considering the level of the adopted access fee caps," just "[a]s it did in 2005 in establishing the preexisting fee caps." JA_ [89.Fed.Reg.at.81662]; *see also* JA_ [89.Fed.Reg.at.81661] (finding ATS fees "informative" in "reflect[ing a] current market rate paid for execution

services").[6] But the Commission made clear that, while "useful in calculating the level of the access fee caps," this "is not the only factor. [Rather, t]he Commission is [focused on] balancing the need to set a level of the access fee caps to allow for fair and efficient access while also seeking to ensure that trading centers are not impaired in their ability to provide execution services." JA_ [89.Fed.Reg.at.81662]. That this level would align with fees charged by ATSs was an "added benefit." JA_ [89.Fed.Reg.at.81735].

The fact that there are differences between these trading centers (Br. 49–50) thus hardly undermines the Commission's determination.[7] And rather than ignoring such differences (as petitioners suggest), the Commission simply disagreed with petitioners that differences between ATSs and exchanges mean "exchange fees should generally be higher" (Br. 50). Among other things, the Commission explained why it did not agree that higher fees to support rebates were necessary to induce transacting on exchange. *See supra* 41–42. It also explained why ATS fees may at times

---

[6] Petitioners' facile protest that "whether electronic communication networks were relevant to the Commission's fee-setting inquiry nearly twenty years ago says nothing about whether alternative trading systems are a proper benchmark for a drastically reduced access-fee cap today" (Br. 50) misses the point. Both in 2005 and in 2024, the Commission considered fees charged by other trading centers because they can "reflect[] a competitive rate," JA_ [89.Fed.Reg.at.81649], that should "not impair the agency market business model," 70 Fed. Reg. at 37545.

[7] For the same reason, the Commission was not required to compare the access-fee cap to fees charged by every trading center (*contra* Br. 53).

be higher than exchange fees—for instance, when ATSs provide services not offered by exchanges.  *See* JA\_ [89.Fed.Reg.at.81735n.1442].

Petitioners' criticism of the Commission's approximation of ATS fees (Br. 51–53) fares no better.  The Commission recognized that ATS fees can be hard to pinpoint, as they "generally do not have a standard structure and are often negotiated between the ATS and the customer."  JA\_ [89.Fed.Reg.at.81698].  Nevertheless, "[b]ased on a review of item 19 in form ATS-N" and on industry comments, the Commission estimated that "they are often in the range of 10 mils."  *Id.*; *see also* JA\_ [89.Fed.Reg.at.81735n.1442] (acknowledging "that maximum ATS fees can exceed 10 mils," but concluding that the "most closely comparable" ATSs "charge a maximum of 10 mils").  Although petitioners complain that the Commission used (among other things) input from "critics of the prevailing fee-and-rebate model" (Br. 51), "reliance on comments from affected parties is not only permissible but often unavoidable."  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) (cleaned up). Nor do petitioners explain why their comments (as proponents of the prevailing fee-and-rebate model) are somehow entitled to more weight.  *Cf., e.g.*, Br. 49–50.  The Commission reasonably engaged with commenters' conflicting viewpoints and with the record evidence regarding ATS fees and functions in determining that comparable ATS fees "are often in the range of 10 mils," and thus on par with the new fee cap.  JA\_ [89.Fed.Reg.at.81698]; *see* JA\_ [89.Fed.Reg.at.81735n.1442].  While petitioners disagree with this conclusion, that disagreement amounts to

little more than a "quibble with the [agency's] policy choices and not with the explanation it has given." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 530 (2009) (it is not for courts—or petitioners—to "substitute [their] judgment for that of the agency").

### 3. Petitioners' speculative concerns about their bottom lines provide no basis for overturning the Commission's reasoned decision-making.

Petitioners baselessly question the Commission's conclusion that the Access-Fee-Cap Amendment will "continue to allow the exchanges to provide execution services using their current business models, innovate and compete for order flow, while also reducing the costs to investors." JA_ [89.Fed.Reg.at.81658]. In amending the access-fee cap, the Commission gave significant weight to "allowing for a diversity of business models" and "preserving the ability of the national securities exchanges to continue to operate" under their current structures, even over criticism that the Commission was being too "protect[ive] of existing exchange fee models." JA_ [89.Fed.Reg.at.81657–59]; *see supra* 46–47. The Commission considered exchanges' current net capture for transactions in NMS stocks priced at/above $1 and determined that, despite often charging at the 30-mils maximum, exchanges generally retained only around 2 mils after rebating nearly all that fee. *See* JA_ [89.Fed.Reg.at.81694–99]. It accordingly concluded that a cap of 10 mils would permit exchanges to "assess fees for transaction services at a level that will result in the same net capture as they earn today if they so choose," thus preserving their ability to

operate and innovate as they currently do.  JA\_ [89.Fed.Reg.at.81656,81658].

The Commission's net-capture analysis was reasonable (*contra* Br. 56–57).  As the Commission explained, precisely quantifying "net capture on a given exchange" is not feasible given exchanges' "[c]omplex fee schedules and volume-based tiers" and opaque or nonpublic financial statements.  JA\_ [89.Fed.Reg.at.81696].  Nevertheless, after reviewing available information, including exchanges' current fee-and-rebate schedules and "information from the financial statements of the three major exchange groups which collectively account for the overwhelming majority of trading volume on exchanges" as well as comments and "staff conversations with industry members," the Commission reasonably approximated exchanges' net capture for relevant transactions at 2 mils. *Id.*; *see also* JA\_ [89.Fed.Reg.at.81649n.411,81658] (setting estimate of 2 mils, with a range of approximately 2 to 6 mils).  Tellingly, petitioners did not, and do not now, offer anything to contradict this estimate of their own net capture; to the contrary, they presented data "consistent with the 2 mil net capture rate assumption used in the [Commission's] analysis."  JA\_ [89.Fed.Reg.at.81696&n.1105].

Petitioners respond with the non-sequitur that the Commission failed to empirically determine that exchanges' access fees are "excessive" and instead "assumed that the vast majority of the revenue that exchanges generate from access fees is used to fund rebates as opposed to execution services" based "on the conclusory assertions of a handful of commenters

52

that exchanges charge excessive fees." Br. 57–58. But the Commission never asserted that petitioners' fees were "excessive." Rather, "[g]iven the low net capture rates, the Commission conclude[d] that in most cases, access fees are typically used to fund rebates and not used exclusively to fund execution services," a conclusion with which commenters agreed. JA_ [89.Fed.Reg.at.81735]; *see also* JA_ [89.Fed.Reg.at.81696].

Petitioners likewise err in claiming that the Commission "did not adequately explain why exchanges will be able to maintain [the] net capture rate of 2 mils under the amended fee cap." Br. 57. The Commission found it "reasonable to estimate that exchanges would realize a similar net capture rate [under the Rule] because the current net capture rate will remain possible." JA_ [89.Fed.Reg.at.81733]; *see also* JA_ [89.Fed.Reg.at.81656] (noting that "trading centers who wish to use rebates to attract liquidity may continue to do so" while "retain[ing this] net capture"). The Commission recognized some uncertainty "should trading venues choose to alter their business model in response to the change in access fees." JA_ [89.Fed.Reg.at.81733]. But having deliberately chosen a fee cap that would permit exchanges *not* to fundamentally alter their business models, the Commission reasonably anticipated that exchanges' net capture would remain the same. JA_ [89.Fed.Reg.at.81658]. And given its reasonable determination that exchanges could retain their net capture and business models, the Commission also reasonably concluded that the Access-Fee-Cap Amendment should not impede exchanges' ability to operate and innovate (*contra* Br. 55–56).

Petitioners offer no argument or evidence to contradict this conclusion. Instead, they point to the Commission's acknowledgment that exchanges will face "a loss in revenue" as a result of the revised 0.1% cap for transactions priced below $1—a separate subset of transactions for which exchanges do not generally offer offsetting rebates—and that it is theoretically "possible that this could impact exchange investment in new technologies." JA_ [89 Fed. Reg.at.81740]. But petitioners do not independently challenge the 0.1% cap. *See supra* 46 n.5. And in any event, that revenue loss does not alter the Commission's fundamental conclusion because the Access-Fee-Cap Amendment and Tick-Size Amendment together are expected to drive order flow, and "hence more trading revenue[,] to exchanges, offsetting this effect." JA_ [89.Fed.Reg.at.81740]; JA_ [89.Fed.Reg.at.81762].

Petitioners' argument suffers from a more fundamental flaw. As this Court has recognized, the notion "that reduced revenues will [necessarily] cripple [exchanges'] reinvestment in their own products, hurting their customers, defies basic economic principles." *Nasdaq*, 34 F.4th at 1113–14. Ultimately, the Commission concluded that the necessity of conforming the caps for protected quotations priced at/above and below $1, to ensure that investors could receive the benefits of the fee-cap reduction, warranted any such potential reduction in petitioners' revenue. "[T]hat satisfied the Commission's obligations, especially where the agency had to strike a balance between competing statutory objectives of efficiency, competition, and transparency." *Id.* at 1110 (cleaned up).

"All in all, the Commission acted well within its authority when it evaluated the Rule's anticipated benefits against the possibility of harm to petitioners' respective bottom lines." *Id.* at 1114. Petitioners' speculative concerns and "narrow focus on their own incentives" cannot overcome the Commission's reasoned balancing of interests and efforts to improve trading for investors. *Id.* at 1112. The Court should "decline[]" petitioners' invitation "to re-weigh the technically complex trade-offs the Commission carefully considered." *Id.* at 1114.

*       *       *

The Court should reject petitioners' APA arguments for the reasons discussed above. But were the Court to find that the Commission failed to adequately explain its adoption of the Access-Fee-Cap Amendment, it should remand without vacatur to allow the Commission to "redress [any such] failure on remand." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477-78 (D.C. Cir. 2022). Were the Court nonetheless to vacate the Access-Fee-Cap Amendment, the Commission agrees with petitioners (Br. 60) that the Tick-Size Amendment should also be vacated because, as the Rules' severability provision indicates, it cannot operate independently. *See* JA_ [89.Fed.Reg.at.81722]; *see also generally* SIFMA Br. The unchallenged provisions (*supra* 19 n.2) should remain in effect.

## CONCLUSION

For the reasons discussed above, the Court should deny the petition for review.

Respectfully submitted,

JEFFREY B. FINNELL
*Acting General Counsel*
TRACEY A. HARDIN
*Solicitor*
DOMINICK V. FREDA
*Assistant General Counsel*

DANIEL E. MATRO
*Senior Appellate Counsel*
/s/Brooke J. Wagner
BROOKE J. WAGNER
*Appellate Counsel*

SECURITIES AND EXCHANGE
 COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292 (Wagner)
wagnerbr@sec.gov

March 7, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 12,919 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point Georgia Pro font.

*/s/Brooke J. Wagner*
Brooke J. Wagner

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/*Brooke J. Wagner*
Brooke J. Wagner